**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| JOHN FRALISH and YEVONNE POWERS, individually and on behalf of others similarly situated,<br>Plaintiffs,<br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br>Defendant. | ) | Case No. 3:22-cv-00336-DRL-MGG<br><br><br><br><br>**Jury Trial Demanded** |

**AMENDED COMPLAINT**
**CLASS ACTION**

1. Liberty Mutual Insurance Company ("Liberty Mutual" or "Liberty") is one of the most prolific robocallers in the United States, launching tens of thousands of prerecorded message calls (i.e., "robocalls") and text messages into the State of Indiana each month to encourage the purchase of its products and services.

2. Liberty uses "robocalls" for this outreach instead of live operators, because it does not know if the people it is calling are truly interested in its products and services.

3. Liberty does not know if its call recipients are truly interested because it purchases the phone numbers it calls from "Lead Aggregators," which are companies that specialize in purchasing and selling marketing leads.

4. Often through daisy-chains of intermediaries, Lead Aggregators purchase the leads they sell to Liberty from "Lead Generators." These companies operate websites where consumers may enter their information, purportedly to request information, and whose data – unbeknownst to the consumer – is thereafter sold off to myriad third parties. Anyone up the chain, from intermediary Lead Aggregators to product sellers like Liberty, then claims to have "consent" to call the consumer, by virtue of their purchase of these so-called "opt in" leads.

5. Although the TCPA requires that Lead Generators that gather consumer information make it clear and conspicuous to the consumers entering information into their websites that they are agreeing to receive prerecorded robocalls telemarketing particular products or services to their phone number for a particular seller, this almost never happens.

6. Instead of a clear and conspicuous disclosure that the consumer will receive robocalls from a particular company (such as Liberty Mutual), Lead Generator websites typically cast a broad net for purported "consent," listing at times thousands of entities in a hyperlink buried in fine print.

7. The upshot is that consumers who place their phone numbers into a Lead Generator website wind up being inundated with dozens – or *hundreds* – of unexpected and unwanted telemarketing calls from multiple companies such as Liberty.

8. Further, because callers like Liberty have no relationship with the Lead Generators that originate the leads, and do not know who else has purchased the leads, there exists no meaningful way to make the calls stop. The consumer is stuck receiving calls in virtual perpetuity, until the lead is deemed so old that it is unsalable, which can take years.

9. Liberty's practices do not confer it with the "prior express written consent" required under the TCPA for prerecorded-voice telemarketing. Rather, they are an abuse.

10. Given the automated nature of robocall violations, and the cost of litigation as compared with individual recoveries, a class action is the only practicable means of obtaining redress for Liberty's illegal, prerecorded-voice calls, and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## INTRODUCTION

11. Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective. However, this technology has also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telecommunications abuses. As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes…. Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

12. As is relevant here, the TCPA's regulations prohibit initiating any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an artificial or prerecorded voice, to any cellular telephone number or residential line, without the prior express written consent of the called party. 47 C.F.R. § 64.1200(a)(2)-(3). The TCPA provides for injunctive relief and the greater of actual damages or $500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(b)(3).

13. An affirmative defense is available if before the calls the seller (here, Liberty) first obtains a signed, written agreement with the person called (here, each Plaintiff and class member), that identifies the phone number to be called, and contains a "clear and conspicuous disclosure" that:

> (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the person … telemarketing calls using [a] prerecorded voice; and

> (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

47 C.F.R. § 64.1200(f)(9).

14. In *In re Urth Access, LLC*, EB File No. EB-TCD-22-34232, 2022 WL 17550566, at *6 (FCC Dec. 8, 2022), the FCC considered a "consent farm" scheme (substantially similar to that which Liberty relies upon here), and found Urth Access' consent procedures wanting:

> … for telemarketing calls, the Commission requires the caller to provide a "clear and conspicuous disclosure" when obtaining prior express written consent.
>
> [Urth Access'] websites included TCPA consent disclosures whereby the consumer agreed to receive robocalls from "marketing partners."
>
> These "marketing partners" would only be visible to the consumer if the consumer clicked on a specific hyperlink to a second website that contained the names of each of 5,329 entities.
>
> We find that listing more than 5,000 "marketing partners" on a secondary website is not sufficient to demonstrate that the called parties consented to the calls from any one of these "marketing partners."

(paragraph breaks supplied; emphasis added).

15. The FCC has subsequently reaffirmed that placing a company's name in a list of numerous other possible sellers on a separate webpage is an "abuse," and does not constitute prior express written consent. *In re TCPA: Closing the Lead Generator Loophole Order*, __ FCC Rcd. __, 2023 WL 8826682, ¶¶ 30-53 (FCC Dec. 18, 2023), available at https://www.fcc.gov/document/fcc-closes-lead-generator-robocall-loophole-adopts-robotext-rules (the "Lead Generator Loophole Ruling").

**PARTIES**

16. Plaintiff John Fralish is a natural person who resides in St. Joseph County, Indiana, in this District. Plaintiff received the calling at issue in this case to his residential cell

phone number while in this District. Fralish's residential phone number on which he received these calls was at all relevant times on the National Do Not Call Registry. It is his personal number, and not part of a business plan.

17. Plaintiff Yevonne Powers is a natural person who resides in Bedford County, Virginia. Ms. Powers received the calling at issue in this case on her residential cell phone number. Powers' residential phone number on which she received these calls was at all relevant times on the National Do Not Call Registry. It is her personal number, and not part of a business plan. Powers is a member of the class originally pleaded in this action.

18. Defendant Liberty Mutual Insurance Company is a Massachusetts corporation headquartered at 175 Berkeley Street, Boston, MA 02116. Liberty Mutual does regular and continuous business in Indiana, including in this District. Liberty maintains physical offices in Indiana, including at 3454 Douglas Rd., Ste. 220, South Bend, IN 46635, in this District. Liberty maintains numerous insurance agents in this District, and advertises such on its website.

**JURISDICTION AND VENUE**

19. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

20. The Court also has Class Action Fairness Act jurisdiction because, on information and belief (including the automated nature of Liberty's calls and its size as one of the largest insurance companies in America), the nationwide class is comprised of at least ten thousand members, at least one class member is a citizen of a different state from where Defendant is a citizen, and the aggregate damages exceed $5,000,000, exclusive of fees, costs and interest.

21. Liberty's TCPA marketing lead purchasing, prerecorded message calling, and

compliance is overseen by personnel who are based in – and operate from – this District, just outside of South Bend. On information and belief, such personnel work out of Mishawaka, IN.

22. Liberty Mutual exploits the Indiana market by blanketing its consumers with robocalls, relying upon the “abusive” consent practices described herein. Although she lives in Virginia, Plaintiff Powers was called pursuant to the same calling and consent policies and procedures as Fralish and the other Indiana-based consumers Liberty called.

23. Defendant systematically, continuously, and deliberately did and attempted to do business in this District and throughout Indiana, and generated revenue as a consequence of resulting sales to Indiana consumers—including through the telemarketing calls at issue here. And not only that, but Liberty Mutual thereafter performs on those sales by providing the insurance-related products and services marketed and purchased during its telemarketing calls to Indiana consumers.

24. Liberty Mutual purposefully availed itself of the privilege of doing business in Indiana, and purposefully directed its business activities into this state—and it is those systematic policies and practices used for contacts into this forum from which the claims of both Plaintiffs and the class in this matter arise out of or relate.

25. Plaintiff’s and the class members’ injuries here directly relate to (and, indeed, arise out of) Liberty Mutual’s affirmative efforts to advertise to and serve the Indiana market, and maintenance of this action in this District therefore does not offend traditional notions of fair play and substantial justice. The Court has personal jurisdiction over Defendant.

26. Venue is appropriate in this District because Plaintiff Fralish received the calls that are the subject of this case while in this District, and Liberty made tens of thousands (or millions) of robocalls nearly identical to Fralish’s pursuant to the same “abusive” consent

policies and practices, into this District. Venue is also appropriate because Liberty's TCPA marketing lead purchasing, prerecorded message calling, and compliance is overseen by personnel who are based in – and operate from – this District.

**FACTS**

27. Liberty Mutual is engaged in a prolific prerecorded-voice call campaign to American consumers, robocalling many millions of consumers' residential and cellular telephones, without proper consent, over the course of several years.

28. Instead of obtaining marketing leads directly from consumers, Liberty purchases the phone numbers it robocalls from Lead Aggregators, who themselves purchase the leads from still-further-removed, third-party Lead Generators.

29. Lead Generators purport to obtain their leads from interactions on websites where someone enters their personal information and clicks a button to receive information.

30. The vast majority of websites for the Lead Generators whose leads Liberty purchases purport to obtain consent for thousands of companies at once through a single click of the mouse. This process is demonstrated below.

31. What is more, the list of companies that the consumer purportedly "consented" to receive calls from does not appear on the web page the consumer typically visits.

32. Instead, the list of entities whom Liberty contends obtained consent to robocall the consumer appears in a hyperlink to "Marketing Partners", a "Provider Network", or similar, in a font that is below and smaller than the font used for marketing copy.

33. Lead Generator websites' references to "Marketing Partners", "Provider Network", or similar in the context of Liberty Mutual is misleading, because Liberty generally has no relationship with these companies as to lead generation (or otherwise).

34. That said, Liberty's policy is to not make robocalls unless its TCPA compliance personnel has approved the "consent" disclosures on the Lead Generators' websites.

35. Once the consumer clicks the "submit" button (or similar), their personal information goes through a vigorous sale-and-resale process to multiple buyers, each of which believe they have consent to call the consumer.

36. Liberty relies upon a TCPA compliance company called Jornaya to assist in making sure it has "consent" to call the leads it purchases (though deficient).

37. Liberty keeps track of the "consent" disclosures through its vendor, Jornaya.

38. Jornaya's interface, to which Liberty pays substantial sums to access, looks similar to the following:






39. Liberty's attorneys and compliance department determine how strict – or loose – the parameters for which leads are purchased and called are, as depicted above. For example, one part of Jornaya's service was designed to notify its customers if there is indicia of fraud in connection with the lead, and another assesses the font size, color, and other attributes of the TCPA consent disclosures.

40. Based upon the fact that Liberty called both Powers and Fralish despite that certain of their demographic information was unverified, Liberty's parameters were very loose, i.e., set so that Liberty cast a wide net, purchasing and robocalling leads despite that Jornaya returned data indicating that the leads were invalid and/or unverifiable.

41. Additionally, although the TCPA requires that "prior express written consent"

occur through a signed, written agreement that contains specific disclosures, 47 C.F.R. § 64.1200(f)(9), most of the leads Liberty purchases fail to adhere to the E-Sign Act's separate requirements for a valid electronic disclosure and signature, 15 U.S.C. § 7001. This independently makes Liberty's attempt to use them as "consent" invalid.

42. The E-Sign Act requires, among other things, that the consumer separately consents to proceed electronically before receiving the requisite TCPA disclosures (including by receiving the separate E-Sign Act disclosures identified in 15 U.S.C. § 7001(c)(1)), and truly intends to "sign" the record.

43. As one can see below, none of the disclosures purportedly provided to Plaintiffs directly mention the E-Sign Act at all, let alone purport to satisfy its requirements.

**Plaintiff Powers – Call Wave One**

44. Plaintiff Powers is the subscriber and user for residential cellular telephone number 540-xxx-0201, to which Liberty Mutual has made multiple, unsolicited calls using an artificial or prerecorded voice to encourage the purchase of its products and services.

45. For example, Liberty Mutual called Powers using prerecorded messages from caller ID 513-230-7972 nine times between December 3, 2020 and December 7, 2020, similar to those Plaintiff Fralish received, described below.

46. Liberty also sent Powers an advertising text message on December 3, 2020, initiated to try to sell her its insurance.

47. The marketing lead that caused these calls originated with a Lead Generator that used the following web form to induce Powers to enter her information:




48. The part of this page that says “Providers Include:” has nothing below it.

49. When a consumer reviewed this web page in “real life,” the fine print at the bottom of the page was either completely obscured, or at best obfuscated.

50. A virtual video of the entire alleged lead generation process as allegedly preserved by Jornaya is available at: https://vp.leadid.com/playback/9E3AC473-5131-85B5-3081-33A1FFB9C939/1607025827.6089?key=1607025777228.

51. Jornaya did not capture the green hyperlinked portion of the above disclosures concerning “our marketing and re-marketing network,” and neither Liberty nor Jornaya knows or keeps track what entities (if any) were listed on that web page at the time this lead was generated.

52. Upon information and belief, there were a thousand or more entities listed on the

landing page as the lead generator's "marketing and re-marketing network."

53. What is more, the final web page of the process for this Powers lead, which appeared after the green button was pressed, states that Powers was matched up with Progressive, The Zebra, National Family Assurance, and Allstate, but <u>not</u> Liberty Mutual.

54. Although Powers believes she visited the above website and entered her information, she did not understand the website to authorize Liberty Mutual to robocall her cell phone number, and did not intend to consent to such.

55. Indeed, because of the hidden disclosures available only through font that is smaller than the font used for marketing materials, and a hyperlink to a set of a thousand or more otherwise undisclosed "marketing and re-marketing network" partners (and their "affiliates" and "representatives"), no reasonable consumer clicking on the green button above would expect to receive robocalls from Liberty Mutual arising from such.

**<u>Plaintiff Powers – Call Wave Two</u>**

56. Liberty Mutual made another wave of prerecorded message calls to Powers from caller ID (540) 707-5728, with approximately eight telemarketing calls and one telemarketing text message between January 27, 2020 and January 31, 2020, similar to those Plaintiff Fralish received, described below.

57. According to Liberty Mutual, Powers visited an InsuredNation website on her mobile device and entered her information in the form below.







A mobile phone screen is too small to display the entire disclosure section (both in "real life" and in this complaint), so Plaintiff has pasted that section on the right.

58. A virtual video of the entire alleged lead generation process as allegedly preserved by Jornaya is available at: https://vp.leadid.com/playback/24019C78-6D0E-9EF5-3724-4CF0619473F1/1703087059.3659?key=1580161407875.

59. When a consumer reviewed this web page in "real life," the fine print at the bottom of the page was either completely obscured, or at best obfuscated.

60. Jornaya did not capture the hyperlinked portion of the above disclosures concerning "marketing partners (listed here)," and Liberty does not know what entities (if any) were listed at the time this lead was generated.

61. Upon information and belief, at the time of the lead event, clicking on the "marketing partners (listed here)" hyperlink would return a web page similar to but not necessarily identical to Ex. A, with hundreds of unrelated entities, each of which purport to have consent to robocall Powers' cell phone number.

62. Although Powers visited the above website and entered her information, she did not understand the website to authorize Liberty Mutual robocalls to her cell phone, and did not intend to consent to such.

63. Indeed, because of the hidden disclosures available only through font that is smaller than the font used for marketing materials, and a hyperlink to a set of otherwise undisclosed "marketing partners," no reasonable consumer clicking on the blue button above would expect to receive robocalls from Liberty Mutual arising from such.

64. Powers did not provide prior express written consent or otherwise agree to receive the calls at issue from Liberty Mutual to her cell phone number.

**Plaintiff Fralish**

65. Plaintiff Fralish is the subscriber and user for residential cellular telephone number 571-xxx-5098 to which Liberty Mutual has made multiple, unsolicited calls using an artificial or prerecorded voice.

66. Liberty Mutual called Fralish using caller ID (479) 279-6439 on at least the following occasions:

a. Three calls on July 17, 2021, at approximately 9:43 a.m., 12:54 p.m., and

1:37 p.m. and one text message;

b. Two calls on July 18, 2021, at approximately 11:26 a.m. and 3:09 p.m.;

c. Two calls on July 19, 2021, at approximately 10:26 a.m. and 5:25 p.m.;

d. One call on July 20, 2021, at 11:22am;

e. One call on July 21, 2021, at 9:50 a.m.

67. For example, during the call received on July 17, 2021, at 9:44 a.m., Liberty Mutual left Plaintiff the following voicemail message that obviously played a prerecorded voice:

> For over 100 years, we've provided secure, reliable, and affordable auto insurance. To review a quote that could save you 100's, you can call us back at this number. If you've changed your mind and are no longer interested, you can call us back toll-free at (888) 475-4204 to cancel the quote and be removed from our list.

68. As another example, on July 17, 2021, at approximately 1:39 p.m., Liberty Mutual left Plaintiff the following voicemail message using a prerecorded voice:

> … [Liberty Mut]ual. Understanding your coverage options shouldn't be so hard. Let us guide you through the process of finding auto insurance coverage that fits your lifestyle and finances. To review a low-rate quote, you may call us back at this number. If you've changed your mind and are no longer interested, you can call us back toll-free at (888) 475-4204 to cancel the quote and be removed from our list.

69. As another example, on July 18, 2021, at approximately 11:28 a.m., Liberty Mutual left Plaintiff the following voicemail message using a prerecorded voice:

> [At Liberty Mut]ual, we understand that finding auto insurance takes time and is often hard to understand. We'll help you take care of this! To review a quote, you may call us back at this number. If you've changed your mind and are no longer interested, you can call us back toll-free at (888) 475-4204 to cancel the quote and be removed from our list.

70. As another example, on July 20, 2021, at approximately 11:24 a.m., Liberty Mutual left Plaintiff the following voicemail message using a prerecorded voice:

> [At Liberty] Mutual, we haven't had much luck reaching you over the past few days. It only takes a few minutes to find auto insurance that fits your situation and offers great savings. To review an affordable quote, you may call us back at this

> number. If you've changed your mind and are no longer interested, you can call us back toll-free at (888) 475-4204 to cancel the quote and be removed from our list.

71. All of the calls Fralish received from Liberty Mutual played a voice message that Fralish – and anyone else listening – can plainly tell had been recorded ahead of time given the intonation and how, for example, identical parts of the same recording were repeated across different calls.

72. Fralish called (888) 475-4204 twice. When the recipient picked up, it played a prerecorded message that identified Liberty Mutual.

73. The above calls were all made by Liberty Mutual, for the purpose of encouraging Fralish to purchase its insurance goods or services.

74. On information and belief, Fralish received additional prerecorded calls or other contacts from Liberty Mutual, too.

75. Indeed, Liberty Mutual also sent at least one text message to Fralish's cell phone number on July 17, 2021, to encourage the purchase of Liberty Mutual insurance. On information and belief, Liberty sent this text message to Fralish, and similar text messages to other class members, as part of a comprehensive marketing plan developed in conjunction with its call vendor Drips, which Liberty approved.

76. Fralish did not consent or otherwise agree to receive the calls at issue from Liberty Mutual to his cell phone number.

77. Liberty contends that Fralish or someone on Fralish's behalf visited a website, PolicyPilot.com, and filled out demographic information along with Plaintiff's residential phone number, on July 16, 2021. The consent disclosures on that website (according to the applicable Lead Generator, Core Digital) were:

Enter your phone number below to consent to receive autodialed and/or pre-recorded calls only from us and/or the providers that are matched to you.

**Phone Number:**

*** *** ****

**Street Address:**

*********

**My State/City:**

**VA - Arlington**

**See My Results**

1. To be matched with, and contacted by, up to 5 participants in the LMBIS Provider Network about insurance and financial services products, and consent (not required as condition to purchase a good/service) for us and them to contact you for marketing purposes (including through the use of an automatic telephone dialing system, artificia prerecorded means) via telephone or text at the phone number provided above (includi SMS and MMS), and email, even if you are on a corporate, state or national Do Not call Registry. I understand that I can revoke my consent at any time. As an alternative, you r contact us by email at customercare@coredigital.com.

2. To the LMBIS Terms of Use, Privacy Policy, and Consent to Doing Business Electronically.

3. Additionally, if selected above, you consent to be matched to up to an additional 3 providers about Health Insurance services, Home Refinance services, and Home Insurance services, and consent (not required as a condition to purchase a good/servic for us and them to contact you for marketing purposes (including through the use of ar automatic telephone dialing system, artificial or prerecorded means) via telephone or te at the phone number provided above (including SMS and MMS), and email, even if you on a corporate, state or national Do Not call Registry. I understand that I can revoke my consent at any time. As an alternative, you may contact us by email at customercare@coredigital.com.

4. To share my information to the providers in our network for the purpose of providing with information about their insurance services and products. You agree that PolicyPilc can share your personal data and contact information with third parties, such as financ services partners, partner companies, and other affiliates, and that these parties may u your personal data and contact information for marketing and analytics, and to make y experience easier.

78. The above was "snipped" from a virtual video of the alleged lead event Jornaya posted on the Internet and which Liberty contends displays Fralish's opt-in to receive its robocalls, available at: https://vp.leadid.com/playback/43E065D9-B6F2-1772-B6E9-253A34146593/1626461099.9387?key=1626460749822.

79. Liberty purchased the lead that contains Fralish's phone number, even though it received multiple warnings from Jornaya that the lead was invalid before purchase, and before robocalling the number.

80. For example, Jornaya's system notified Liberty that the vital demographic information for the lead – including the telephone number – was ***unverifiable*** via Jornaya's system, meaning that Jornaya was not able to confirm that the subject data was entered during the visit to the website:

| Contributed Data | Data Provided by the Jornaya Client ("Contributed Data") for Verification | Verified by the Jornaya Service |
|---|---|---|
| Zip | 20190 | No |
| City | RESTON | No |
| Address 1 | 16 th Street North | No |
| Phone 1 | 571[redacted]5098 | No |
| Email | jchai01@gmail.com | No |
| Last Name | Chai | No |
| First Name | Jun | No |

Upon information and belief, there were other "red flags" from Jornaya that this lead was suspect, which Liberty is unreasonably withholding in discovery. Regardless, Liberty purchased the lead and robocalled it in spite of multiple warnings from Jornaya.

81. When a consumer reviewed the above PolicyPilot.com web page in "real life," the fine print at the bottom of the page was either completely obscured, or at best obfuscated.

82. As one can see, the website on which Liberty contends Fralish placed his phone number does not mention Liberty Mutual at all, and instead – as condemned as "abusive" by the FCC – it includes a hyperlink in the fine-print to a list of "LMBIS Providers."

83. The list of "LMBIS Providers" as produced by Core Digital pursuant to a subpoena, purports to have obtained consent for approximately 2,018 entities, many of which are equivocal ("HHA," "Heritage" "Marathon," "Motors," "Northwestern" "PURE") and/or non-sequitur or silly ("Pier21 Media", "Happy Days," "Modern Woodmen of America," "Quilt", and "Ray Chisolm"). Ex. B.

84. The statement that Liberty is a "LMBIS Provider" is not true: Liberty does not

have a relationship with LMBIS/Core Digital as to Lead Generation, and as a general rule it has no relationship with *any* of the Lead Generators that originate or "create" the leads it purchases from Lead Aggregators.

85. What is more, Jornaya was unable to verify the demographic information for the lead Liberty attributes to Plaintiff, indicating that such information was not properly captured by Jornaya's system. *See* Ex. C at 5.

86. Liberty reviewed lead data, approved the consent disclosures, and robocalled more than 28,000,000 unique cellular or residential line numbers, just like it did for the three listed above as to Plaintiffs, between 2017 and the present.

87. Liberty Mutual's violations were negligent. Alternatively, they were willful and knowing.

88. Liberty Mutual has been sued in the past for similar telemarketing violations, and its executives and legal teams were on actual notice that its practices were resulting in nonconsensual calls to consumers' phones like those alleged here. *See, e.g., Johansen v. Liberty Mutual Group Inc.*, No. 1:15-cv-12920 (D. Ma.) (Liberty Mutual settled TCPA do-not-call violation claims with consumer, and then tried to seek indemnity from its third-party vendors); *Smith v. Liberty Mutual Ins. Co.*, No. 1:20-cv-11583 (D. Ma.) (consumer sued Liberty Mutual for alleged TCPA robocall violations). Nonetheless, Liberty Mutual has continued to reap the benefits of nonconsensual prerecorded calls, choosing profits over consumer privacy and safety.

89. Plaintiffs and the class have been damaged by Liberty Mutual's calls. Their seclusion and privacy were improperly invaded, Liberty Mutual's calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls. Liberty Mutual's calls were annoying and a nuisance, and wasted

the time of Plaintiffs and the class. *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (finding TCPA violations present concrete injury-in-fact sufficient for Article III standing); *Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 740 (2012) (noting congressional findings of consumer "outrage" as to autodialed and prerecorded-voice calls).

## CLASS ACTION ALLEGATIONS

90. Plaintiffs bring this action under Federal Rules of Civil Procedure 23(b)(2) and (b)(3), on behalf of a class consisting of:

> **Robocall Class**: All cellular subscribers and/or residential subscribers in the United States whose telephone number Liberty Mutual, or some third party on its behalf, called using an artificial or prerecorded voice, where (a) the originating Lead Generator website did not mention Liberty in any non-hyperlinked TCPA disclosure Jornaya logged applicable to the alleged lead, and (b) there was no separate consent obtained to proceed electronically (e.g., pursuant to the E-Sign Act) before TCPA consent was allegedly obtained.
>
> > **Wrong Number Subclass**: Plaintiffs allege a subclass of persons for whom the "Phone" portion of the Jornaya "Guardian TCPA Report" failed to return as "Verified."

91. Upon information and belief, there were more than 1,000 persons with Indiana area codes who received calls as identified in each of the Robocall Class and Wrong Number Subclass definitions, in 2021 alone.

92. Common questions of law or fact exist as to all members of the Robocall Class and Wrong Number Subclass, which predominate over any questions solely affecting any individual member, including Plaintiffs. Such questions common include but are not limited to:

a. Whether the calls to Plaintiffs and the Robocall Class and Wrong Number Subclass were made using an artificial or prerecorded voice as such terms are defined or understood under the TCPA and applicable FCC regulations and orders;

b. Whether Liberty Mutual's calls to Plaintiff and the Robocall Class and Wrong

Number Subclass constituted "telemarketing";

c. Whether Liberty Mutual had "prior express written consent" for its calls to Plaintiffs and the Robocall Class and Wrong Number Subclass;

d. Damages, including whether any violations were performed willfully or knowingly, such that Plaintiffs and the other class members are entitled to treble damages under 47 U.S.C. § 227(b)(3).

93. Plaintiffs' claims are typical of the claims of the other members of the Robocall Class and Wrong Number Subclass. The factual and legal bases of Liberty Mutual's liability to Plaintiffs and the other class and subclass members are the same: Liberty violated the TCPA by causing artificial- or prerecorded-voice telemarketing calls to be made to the telephone number of each member of the class and subclass, without permission.

94. Plaintiffs will fairly and adequately protect the interests of the class and subclass. Plaintiffs have no interests that might conflict with the interests of the class and subclass. Plaintiffs are interested in pursuing their claims vigorously, and they have retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

95. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, tens of thousands of classes and subclass members, such that joinder of all members is impracticable.

96. No difficulties are likely to be encountered in the management of this action that

would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

97. Liberty Mutual has acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the class and subclass, thereby making relief appropriate with respect to the class and subclass as a whole. Prosecution of separate actions by individual members of the class and subclass, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

98. The identity of the classes and subclass are, on information and belief, readily identifiable from Liberty Mutual's or its vendors' records.

## COUNT I
## Robocall TCPA Violations

99. Plaintiffs re-allege and incorporate all prior allegations. Plaintiffs bring this count on behalf of themselves and the Robocall Class and Wrong Number Subclass.

100. It is a violation of the TCPA to call cellular numbers or residential lines and play an artificial or prerecorded voice for telemarketing purposes. 47 C.F.R. § 64.1200(a)(2)-(3).

101. Liberty Mutual initiated or caused to be initiated calls to the cellular and/or residential telephone numbers of Plaintiffs and the other members of the class and subclass defined above using an artificial or prerecorded voice, for the purpose of encouraging the purchase of its goods, products, and services.

102. These calls were made even though Liberty did not have prior express written consent from those who received such calls.

103. These calls and violations were willful or knowing.

104. To the extent some of the calls to Plaintiffs and the class and subclass were made

by vendors of Liberty Mutual (e.g., Drips), Liberty Mutual is liable for those calls, too. Liberty controls the minutiae of the calls at issue, from what kind of technology is used, the prerecorded-voice message played, to the parameters and rules under which leads are purchased and contacted. Liberty also ensures that the calls present themselves as calls for Liberty, which prompt the recipient to call Liberty back (which Liberty then handles). Liberty also retains the financial and advertising benefit of these calls, despite knowing that they are being made to people for whom prior express written consent is lacking.

105. Liberty has not altered the conduct complained of herein since this lawsuit was filed. Such obstinance constitutes ratification and warrants both (a) imposition of an injunction prohibiting Liberty from using robocalls until it shores up its consent policies and practice, and (b) treble damages.

106. As a result of Liberty's conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiffs and the other members of the class and subclass were harmed and are each entitled to an injunction and a minimum of $500 in damages for each violation; treble damages if violations are found to have been willful or knowing.

WHEREFORE, Plaintiffs John Fralish and Yevonne Powers, individually and on behalf of the class and subclass, respectfully requests that the Court enter judgment against Liberty Mutual for:

A. Certification of the class and subclass as alleged herein;

B. Damages, pursuant to 47 U.S.C. § 227(b)(3);

C. An injunction:

- prohibiting Liberty Mutual from making – or accepting business derived from – prerecorded message calls, unless it has first obtained the prior express written consent of the subscriber before making the call;

- Requiring Liberty Mutual to engage a Court-approved, independent auditing company to (a) investigate all allegations of TCPA violations, and (b) audit no less than 10% of Liberty's outbound calls – including calls originating from lead generators or vendors – to ensure that Liberty Mutual had proper consent for robocalls, and (c) report the results of the above investigations to the Court and Plaintiffs' counsel on a quarterly basis for no less than five years;

- Requiring Liberty Mutual to include a working, automated IVR opt-out mechanism at the beginning of any and all prerecorded-voice calls;

D. Attorneys' fees and costs, as permitted by law; and

E. Such other or further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: April 29, 2024

JOHN FRALISH and YEVONNE POWERS, individually and on behalf of others similarly situated

By: */s/ Alexander H. Burke*

Alexander H. Burke
Daniel J. Marovitch
BURKE LAW OFFICES, LLC
909 Davis St., Suite 500
Evanston, IL 60201
Telephone: (312) 729-5288
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

*Counsel for Plaintiffs*

**Document Preservation Demand**

Plaintiffs demand that Defendant(s) preserve all records, and direct that all (sub)vendors, agents and other third parties with relevant documents or data do so, too. Defendant(s) should obtain all call data, lead data, and other relevant documents from all applicable (sub)vendors or third parties – particularly if they are located overseas – ***before*** terminating or otherwise taking any steps that might alter its relationship with them. Our experience is that lead generators and other vendors often remove customer access to call records upon termination. Defendant(s) should gather these records first, before taking any steps that might remove access to these types of records. Plaintiffs will assist with reasonable costs of preservation; please contact the attorneys listed here to discuss.