IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JOHN FRALISH, individually and on behalf of others similarly situated,

Plaintiff,

vs.

LIBERTY MUTUAL INSURANCE COMPANY,

Defendant.

CASE NUMBER: 3:22-cv-336-DRL-MGG

* * * * *

The remote deposition upon oral examination of RYAN HEMKER as 30(b)(1), a witness produced and placed under oath before me, Renee R. Dobson, Court Reporter & Notary Public in and for the State of Indiana, was taken via video conference through Zoom on February 14, 2024, commencing at 9:05 a.m., CST, pursuant to notice and the Federal Rules of Civil Procedure. This deposition was taken on behalf of the Plaintiff in the above-captioned matter.

* * * * *

A P P E A R A N C E S

FOR THE PLAINTIFF:
BURKE LAW OFFICES, LLC
Alexander H. Burke (Via Video Conference - Zoom)
Daniel J. Marovitch (Via Video Conference - Zoom)
909 Davis Street, Suite 500
Evanston, Illinois 60201
aburke@burkelawllc.com
dmarovitch@burkelawllc.com

FOR THE DEFENDANT:
SHOOK HARDY & BACKON, LLP
Michael L. Mallow (Via Video Conference - Zoom)
2049 Century Park E., Suite 3000
Los Angeles, California 90067
mmallow@shb.com

ALSO PRESENT:
Rocco Franco, Videographer (Via Video Conference-Zoom)



I N D E X O F E X A M I N A T I O N


| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. BURKE | 5 |
| CROSS-EXAMINATION BY MR. MALLOW | 81 |
| REDIRECT EXAMINATION BY MR. BURKE | 82 |
| CERTIFICATE PAGE | 86 |




I N D E X O F E X H I B I T S

JOHN FRALISH VS. LIBERTY MUTUAL INSURANCE COMPANY
RYAN HEMKER 30(b)(1)/February 14, 2024:


| LETTER | IDENTIFICATION | PAGE |
|---|---|---|
| A | LinkedIn Job History | 13 |
| B | Third Amended Notice of Deposition | 14 |
| C | Jornaya Compliance Report | 23 |
| D | List of Company Names | 28 |
| E | Dft's Responses to Plf's Interrogatories | 37 |
| F | Program Agreement | 39 |
| G | Lead Sales Agreement | 50 |




VIDEOGRAPHER: Okay. This is the beginning of the deposition of Ryan Hemker for Liberty Mutual Insurance Company in the matter of John Fralish vs. Liberty Mutual Insurance Company. Today's date is February 14th, 2024, and the time on the monitor is 9:05 a.m.

My name is Rocco Franco, and I am the videographer. The court reporter is Renee Dobson, and we are here with Huseby Global Litigation.

Counsel, please introduce yourselves after which the court reporter will swear in the witness.

MR. BURKE: Good morning, Alex Burke for the Plaintiff.

MR. MAROVITCH: Dan Marovitch for the Plaintiff.

MR. MALLOW: Good morning. Michael Mallow, Shook Hardy & Bacon for Liberty Mutual.

RYAN HEMKER AS 30(b)(1),
having been first duly placed under oath, was examined and testified as follows:

COURT REPORTER: Thank you.

DIRECT EXAMINATION

BY MR. BURKE:

Q Good morning.

Page 6

A Good morning.
Q Would you state your name for the record, please?
A Yes, Ryan Michael Hemker.
Q And, Mr. Hemker, have you ever given a deposition before?
A Yes, but not a full deposition, but a partial deposition.
Q Okay. Was that in connection with your work, or some personal thing?
A In connection with work.
Q Okay. Would you explain generally the circumstances of the partial deposition?
A There was a -- sorry. There were multiple parties. Apologies. I'm trying to recall all of the specifics of it; but there was a complaint that had been filed against our company by a claimant, and myself and another -- another -- another one of my peers in another department were -- were asked to participate in that.
Q Okay. And so was there a court reporter or a recording happening of the testimony?
A There was.
Q And was it -- was it a testimony given under oath?
A Yes.
Q Okay. And was the subject matter of the testimony

Page 7

for you and your colleague alleged telemarketing -- improper telemarketing?
A I'm trying to remember the specifics of it. It's been a few years on this, and the deposition was only an hour long. I believe it was related to that, but the specifics are a little bit foggy because it's been a few years. Apologies.
Q Can you estimate? Was this deposition before the pandemic or any other milestone you can remember?
A Before the pandemic. Apologies. I'd be guessing even at the year.
Q Okay. Well, so the rules today are probably similar to the rules back then. I'm going to ask questions, and you provide complete and correct answers. Okay?
A Okay.
Q And when you provide those answers, you've got to answer verbally. Otherwise, the court reporter can't take down what you say. Okay?
A Sure.
Q If you ever need a break, you know, answer whatever pending question is out there; and, you know, I'll either agree to a break right away or sometime super soon, so just let me know. Okay?
A Sure. Thank you.
Q When I ask you a question, if you don't understand,

Page 8

let me know, and I'll try to clarify. Okay?
A Yes.
Q But if I ask you a question, and you provide an answer, I'm going to understand that that answer is both factually correct and factually complete. Fair enough?
A Yes.
Q Great.
Where do you work, Mr. Hemker?
A Where do I work, or who do I work for?
Q Where do you work?
A I work at home.
Q Oh, I see. What company do you work for?
A Liberty Mutual Insurance Company.
Q Okay. And what do you do for Liberty Mutual?
A I'm a senior media director.
Q Okay. And what does that mean, "senior media director"?
A So I deploy our media dollars through -- yeah, I direct the deployment of our media dollars.
Q Okay. Would you explain a little bit in more detail what that -- what that means?
A So it's my responsibility to make sure our media dollars are spent in the most appropriate fashion.
Q Okay. And when you say "media," do you mean

Page 9

marketing dollars?
A Correct.
Q Okay. And what are the different types of marketing that Liberty Mutual does that are under your umbrella?
A Under my umbrella, my focus area is -- we refer to it as aggregators.
Q Okay. What's an aggregator?
A An aggregator would be a third party that uses their own media to identify in-market shoppers for insurance.
Q Okay. And how does Liberty Mutual interact with lead aggregators?
A Yes, so the lead aggregator would identify a consumer who is interested in insurance, and Liberty Mutual would communicate with those lead aggregators and present a bid based off of the -- the details of the consumer that's appropriate with our product.
Q Okay. So I think what you're saying is that Liberty Mutual bids and eventually buys leads from these lead aggregators; is that right?
A That's correct.
Q Okay. And is All Web Leads one of the lead aggregators that Liberty Mutual works with?
A Yes.
Q Could you name, you know, a few of the other large lead aggregators that Liberty Mutual works with?

Page 10

A A few of the other large lead aggregators would be, like, EverQuote, MediaAlpha, QuinStreet.

COURT REPORTER: I'm sorry. What was the last one?

THE WITNESS: QuinStreet, Q-u-i-n-S-t-r-e-e-t.

COURT REPORTER: Thank you.

**Q Okay. And when Liberty eyes leads from All Web Leads, EverQuote, MediaAlpha, or QuinStreet, what does it do with those leads?**

MR. MALLOW: Objection. Vague.

A Could you clarify your question?

**Q After Liberty eyes a lead from a lead aggregator, what happens next?**

A In the case where we purchase the lead or win the bid to purchase the lead, then the lead would be sent -- would be sent to a third party that we leverage their services to reach out to the consumer to confirm the appropriate time to speak with them.

**Q Okay. And is one of the companies that reaches out to leads that are purchased from lead aggregators a company called Drips?**

A That's correct.

**Q Okay. And what does Drips do for Liberty Mutual with those leads that were purchased or bid upon and**

Page 11

**purchased from lead aggregators?**

A Drips confirms the time that the consumer would like to speak with Liberty Mutual for an insurance quote.

**Q Okay. And how do they do that?**

A So initially Drips will make an outbound dial with a prerecorded message to the consumer asking them if they want to speak right now, if they want to opt out, or if they want to schedule a call-back for another time.

**Q Okay. And after that initial prerecorded message call, say there's no response, then what happens?**

A An SMS is sent to the consumer confirming it's Liberty Mutual reaching out to them providing a quote based off of the information that they input on the website asking them for a time that would be best for us to speak with them and providing an opportunity to opt out.

**Q Okay. And you mentioned "consumers." I mean, are all these leads that are purchased from All Web Leads or the other lead aggregators, are those all consumer leads?**

A Can you clarify what you mean by consumer?

**Q Well, I mean, I was just sort of riffing off of your response to the last question. I mean, I'll ask it this way.**

**Does Liberty Mutual purchase leads relating to**

Page 12

**businesses that are then forwarded to Drips for the prerecorded calls that you were just testifying about?**

A If your -- can you confirm what you mean by businesses?

**Q I mean, are those prerecorded calls designed to generate consumer business, or are they designed to create or gain new business customers for Liberty Mutual?**

A They're designed to gain new business customers for Liberty Mutual.

**Q I think there's some ambiguity there, so isn't it true that the prerecorded calls that Drips makes for Liberty Mutual are designed to gain new consumer customers for Liberty Mutual?**

MR. MALLOW: Objection. Vague. Not to interrupt, Alex, but maybe you can separate the role by commercial lines of business and noncommercial lines of business.

MR. BURKE: That's a good -- yeah.

MR. MALLOW: I think I know what you're asking, and I just want to -- I'll keep quiet, but that might be a distinction that helps Ryan.

MR. BURKE: Yeah, I appreciate that.

**Q So, Mr. Hemker, would you agree that Liberty Mutual has both consumer customers and commercial customers?**

Page 13

A Correct.

**Q Okay. And are the Drips calls -- the prerecorded Drips calls aimed at gaining consumer customers or commercial customers?**

A Consumer customers, --

**Q Okay.**

A -- individual consumer customers.

**Q Great. If Drips doesn't receive a response to the SMS, then what does Drips do?**

A Drips would make a few more attempts to connect with the consumer to give them an opportunity to tell us when they want to speak with us.

**Q Okay. And all of those attempts are prerecorded-message attempts, right?**

A Yes.

**Q Okay. Let's take a step back.**

(PLAINTIFF'S EXHIBIT A MARKED)

**Q I'm going to show you what I've marked as Exhibit A in an attempt to sort of expedite talking about your background.**

**So I'm placing on the screen -- I'm placing on the screen a printout of a page from LinkedIn. Do you recognize the content of this page?**

A Yes.

**Q Okay. And I acknowledge that, you know, as**

Page 14

frustrating as it is that Adobe doesn't really capture web pages the way they're presented on the internet, is the content in Exhibit A an accurate and complete description of your job history at Liberty Mutual for the last 22 years?
A Looks like this ends in 2012 from what I'm seeing on the screen.
Q What I see ends in 2021 at the top.
A Sorry. I'm looking at the bottom.
Q Oh. Yeah, so it goes oldest to newest as you go up.
A Right. This would be the last -- if my math is correct, the last ten years that I'm seeing on the screen. The 22 years is an indication of how long LinkedIn says that I worked for Liberty Mutual.
Q Okay. And --
A Oh, there we go.
Q Yeah.
A But, yes.
Q Okay. I'm going to show you another exhibit.
(PLAINTIFF'S EXHIBIT B MARKED)
Q This is Exhibit B. This is the Notice of Deposition in this case for your deposition. And instead of naming you as an individual, we described you as "The person most knowledgeable as to any processes and procedures that were implemented by or on behalf of

Page 15

Liberty Mutual, to try to ensure that Liberty Mutual had proper consent to call telephone numbers using prerecorded messages."
My question is would you agree that you are that person most knowledgeable?
A Yes.
Q Thank you.
So do you have an understanding as to where these lead aggregators such as All Web Leads or EverQuote, MediaAlpha, QuinStreet obtained the leads that are ultimately sold to Liberty Mutual?
A I have a general understanding. Can you be more specific on your question?
Q Tell me your general understanding of the origins of the leads that Liberty Mutual purchases from lead aggregators, which are --
A Sure.
Q -- eventually called by Drips?
A Yes, my understanding is consumers would go online to a lead generator also known as a publishers website where the consumer inputs their information and indicates their intention of seeking a quote on the lead generator site. And once Liberty Mutual has validated that that consent is present, then the lead would be eligible for purchase by Liberty Mutual.

Page 16

Q Okay. And are there particular criteria that Liberty Mutual insists upon to -- well, let me back up for a second.
You mentioned the concept of consent in your last -- your last answer. Would you please explain what you meant by consent?
A Yes, that the consumer has opted in to being reached out to by Liberty Mutual for their request for an auto insurance -- an insurance quote.
Q Okay. And when Liberty directs Drips to make prerecorded calls to a particular number, what are the assurances that Liberty Mutual has that the consumer actually consented to that call?
A Yeah, Liberty Mutual leverages a third-party service referred to as Jornaya that confirms that the consent on the part of the consumer was present and that the consumer actively consented in accordance with language that our counsel would deem appropriate.
Q Okay. So what is the process by which Liberty Mutual obtains that confirmation of consent from Jornaya?
A So at the time that a lead is offered up for sale to Liberty Mutual, there is an API between the lead generator and Jornaya whereby Jornaya confirms the presence of all the requirements that Liberty Mutual

Page 17

has within their Jornaya settings.
Q Okay. And so who does that cross-check with Jornaya? Is it All Web Leads? Is it Liberty Mutual? Who does that?
A I believe at this time that it was facilitated by an intermediary company, LeadCloud. They were I would call it our integration partner who was doing the check against Jornaya on behalf of Liberty Mutual.
Q Has Liberty stopped using LeadCloud?
A No.
Q Okay. And is Liberty still making prerecorded message calls to leads that were obtained through lead aggregators today?
A Yes.
Q And has anything about Liberty's policies, practices, or procedures concerning those calls or consent changed since April 2021 [sic] when this action -- or 2022 when this action was filed?
A No.
Q Okay. So when LeadCloud reaches out to Jornaya, what is LeadCloud asking for?
A LeadCloud is asking for confirmation that the -- that the lead that is being presented for sale to Liberty Mutual passes all of the parameters required within Jornaya's settings.

Q Isn't it true that LeadCloud only asked Jornaya to authenticate the LeadiD tokens?
A I don't believe so.
Q Okay. So what is your understanding of what happens at Jornaya when LeadCloud sends lead information to Jornaya to check on whether there was consent?
A So my understanding of what happens is that LeadCloud does send over the Jornaya LeadiD, and then that LeadiD is matched up with the parameters that Liberty Mutual has set within our Jornaya account and confirms that all of those parameters are present and is as expected.
Q Okay. And what are the parameters that Jornaya checks?
A The parameters that Jornaya checks would be, first of all, to ensure that the TCPA, or Telephone Consumer Protection Act, language matches identically to the language that has been previously approved by Liberty Mutual's counsel; that things like the font size and contrast of the font are in accordance with the settings required; that the lead age is no more than one day; and that the lead was not generated all from a call center. There may be a couple other settings, but I think that's -- oh, I'm sorry -- and one final one that I can recall off the top of my head is that we do



require that a video playback can be produced by Jornaya showing the consumer traversing through the form and opting in.
Q Okay. And so what happens when -- so what is the data that LeadCloud receives back from Jornaya if Jornaya's check says, "A-okay-go"?
A My understanding is it's just an accept message back from Jornaya, so "Yes" or "No."
Q Like a binary thing?
A Correct.
Q And what happens when Jornaya finds a lead that it doesn't like that may be invalid?
A It would just reject -- it would send a reject or a "No" message back to LeadCloud.
Q And it's probably like a one or a zero for that; is that right?
A I think it's actually either "Accept" or "Reject."
Q Okay.
A I'd have to double-check on that, but I believe that's the actual messaging.
Q And so I think you mentioned earlier that Liberty Mutual preapproved the consent particulars on the websites where the leads originated; is that -- is that accurate?
A Liberty Mutual's counsel reviews consent language



prior to approving it, yes.
Q Okay. And then who ultimately tells -- well, let me take a step back.
So does -- so what's the term that Liberty uses or which you use internally to refer to the originator of the lead?
A We would either refer to them as the lead generator or publisher.
Q Okay. So is it accurate to say that Liberty Mutual has direct communication with the lead generators insofar that Liberty receives the website information relating to consent and either approves or rejects the consent particulars?
MR. MALLOW: Objection. Vague.
A Yeah, could you clarify, please?
Q How does it work? I mean -- well, let me ask you this.
How many lead generators are -- have websites that are approved by Liberty Mutual with regard to TCPA consent roughly?
A I don't know the exact number. It's -- yeah, I don't know the exact number.
Q It's got to be hundreds, right?
A I would imagine, yes.
Q Okay. And where are the consent-related particulars



stored at Liberty Mutual?
A The consent -- the consent language -- the previously-approved consent language is stored within Jornaya's system.
Q Well, who at Liberty Mutual -- who specifically is in charge of reviewing and approving or rejecting a lead generator's consent particulars?
A Liberty Mutual's counsel.
Q Is there a particular person or division within Liberty Mutual's legal department that deals with this issue?
A I know there's a couple of folks that have been -- that my team has worked with in the past. I couldn't tell you the exact person at that time that we're referencing.
Q Okay. Is one of the lead generators that Liberty works with LowerMyBills?
A So Liberty doesn't work directly with them. As a point of clarification, we work with the lead aggregator.
Q Okay.
A So --
Q If I ever cut you off, just let me know. I want to hear your full answers. Okay?
A Sure.

Page 22

Q Okay. Is one of the lead generators that Liberty Mutual accepts leads from through lead aggregators LowerMyBills?
A That's my understanding.
Q Okay. And LowerMyBills is also known as Core Digital?
A I believe so.
Q Okay. And so with regard to LowerMyBills, do you have any understanding of how Liberty came to approve LowerMyBills's consent language and particulars on its websites?
A Not other than what I --
MR. MALLOW: Hold a second. Objection. Compound and vague. Go ahead.
Q You can answer.
A Not other than what I shared earlier.
Q Has it ever happened that Liberty Mutual wound up calling phone numbers that were determined to have origins that Liberty Mutual had not approved for lead generators? In other words, has Liberty -- has Liberty ever called a phone number that it turned out there was a mistake with Jornaya?
A Not to my knowledge.
Q Okay. And when we talk about consent, you mentioned some of the particulars that Liberty approves such as

Page 23

font size, contrasted font, lead age, lead not generated through call center, and video playback.
Is another one of the categories that Liberty has LeadCloud cross-check with Jornaya the specific language of the consent disclosures from the lead generator website?
A Yes, the previously-approved consent language is one of the parameters that is -- that is checked.
(PLAINTIFF'S EXHIBIT C MARKED)
Q Okay. And I'm going to show you an Exhibit C.
All right. So I'm showing on the screen what I've marked as Exhibit C. This is a compilation of two documents. The first is Bates labeled LM 50 consecutive through LM 54. Actually this is just one document. Great.
Are you generally familiar with the form of Exhibit C?
A Yes.
Q Okay. What is Exhibit C?
A This appears to be a Jornaya compliance report.
Q Okay. And what does this -- what's the purpose of a Jornaya compliance report?
A It enables Liberty Mutual or a company like Liberty Mutual to confirm that consent was provided in accordance with the lead that was purchased.

Page 24

Q Okay. And I have scrolled down to the page Bates numbered LM 53, and I'm showing a box that says labeled, "TCPA Disclosure Statement Captured at the Lead Event." Do you see that?
A Yes.
Q Okay. And to the right of that box that I just read there is a large box with all caps. Do you see that?
A Yes.
Q The large box on Exhibit C is the language upon which Liberty Mutual rests its consent analysis, isn't it?
MR. MALLOW: Objection. Vague.
A Yeah, could you please clarify?
Q Well, I mean, we're talking about consent to receive prerecorded calls from Liberty Mutual, right?
A Yes.
Q And I think you testified earlier that lead generators such as LowerMyBills or Core Digital have language on their websites that Liberty has approved that Liberty believes confers consent for Liberty to call consumers with prerecorded messages through Drips, right?
A Correct.
Q And so my question is when we're looking at Exhibit C, LM 53, the language in this large box, is this the

Page 25

language that Liberty Mutual approves -- or approved for this particular lead?
A That would be my understanding.
Q Okay. And would it be your understanding that everybody who visited -- visited the same website that whoever visited -- let me start -- start that one over.
As a general matter, lead generators try not to change the language in their websites so much; isn't that true?
MR. MALLOW: Objection. Calls for speculation.
A Yeah, I wouldn't know that.
Q Well, I mean, who is in charge of, you know, shuffling consent language -- TCPA consent language back and forth between lead generators and the legal department at Liberty Mutual?
A There's not a direct communication between them.
Q Okay. Is that sometimes you that works as an intermediary between lead generators and Liberty Mutual's legal department?
A The process would typically be that if a lead aggregator has a lead generator that they believe would be a good fit, then they would provide us with the consent language for approval.
Q I understand. Okay. And so the lead aggregator,

which is All Web Leads or EverQuote or QuinStreet Media, is generally in charge with collecting the consent language like what we're looking at on Exhibit C and providing that to Liberty Mutual for TCPA approval; is that right?
A That's correct.
Q Okay. And does Liberty Mutual keep track of the different consent language like we're looking at on Exhibit C?
A Yes, Jornaya would be our repository for that.
Q Okay. And Jornaya has a portal that Liberty Mutual can log into where the consent language like what we're looking at Exhibit C is organized, doesn't it?
A Correct.
Q Okay. And has Liberty Mutual to your knowledge ever exported the consent language of -- for leads from Jornaya?
MR. MALLOW: Objection. Vague.
A Yeah, could you clarify?
Q So the Jornaya portal allows customers like Liberty Mutual to access and download consent information, doesn't it?
A I believe so. It's been a little bit since I've been in there, but I believe so.
Q Okay. Does the Jornaya process -- let me ask you



this.
Do you have any understanding of whether this lead in Exhibit C, whether the consent language for this lead in Exhibit C included hyperlinks or not?
A I don't.
Q Do you know whether Liberty Mutual or Jornaya keeps track of hyperlinks that might appear within consent language that are stored?
A I don't.
Q Looking at Exhibit C, -- and I'll give you an opportunity to go through it -- would you point me to the part of Exhibit C that shows that Liberty Mutual has consent to call this lead?
MR. MALLOW: Objection. Vague.
A So I don't see Liberty Mutual stated by name in this consent language. I think you referenced hyperlinks. I believe it's common that a hyperlink for something like provider network would exist. I do not know in the case of this particular lead if that was in place.
Q Is it possible to tell from Jornaya's records or Liberty Mutual's records whether there were any hyperlinks at the time of a particular lead event?
A I'm not sure.
Q Who would know the answer to that?
A I would assume Jornaya would.



Q Okay. Do you have any idea of whether Liberty Mutual was listed as part of the LM BIS provider network in this lead?
A I don't know on this lead, but I've yet to see an instance where Liberty Mutual is not listed on a hyperlink page.
Q How did it come to be that a lead generator like LowerMyBills or EverQuote or, you know, another lead generator that doesn't have a relationship with Liberty Mutual winds up having Liberty Mutual listed as a company that the leads are providing consent to call using prerecorded messages?
MR. MALLOW: Objection. Vague.
A Yes, I didn't understand that question.
Q You testified a moment ago that you've never seen a hyperlink that didn't link to Liberty Mutual. Is that accurate, or were you saying something different?
A I was saying that I've not seen a hyperlink to a provider network page that didn't have Liberty Mutual's name listed.
Q Okay.
A And for clarity, it would probably read "Liberty Mutual Insurance Company" or "Liberty Mutual Insurance."
(PLAINTIFF'S EXHIBIT D MARKED)



Q I'm going to show you what's been marked as Exhibit D. Exhibit D was produced by LowerMyBills. Are you familiar with this document?
A I'm not. This is the first I've seen it.
Q And just for clarity and the record, this document has been de-designated as "Confidential." It's not confidential anymore. And the Bates ranges Fralish-Core Digital 21 to 65.
So I've sort of scrolled through this long document quickly.
Is this document typical of the kind of list that a lead like the one we're looking at in Exhibit C references in a hyperlink?
MR. MALLOW: Objection. Vague.
A Could you please rephrase?
MR. BURKE: Renee, would you just read back the question?
COURT REPORTER: Sure.
(REPORTER READS BACK THE QUESTION ON PAGE 29, LINES 5-13)
MR. MALLOW: Again, objection. Vague.
Q You can answer.
A Yeah, this document, I have seen pages like this before. As far as whether or not it's typical, I would be speculating on that if we're talking about all of the, as you referenced earlier, hundreds of lead

generators.
**Q Okay.**
A Let me further clarify what I mean by that. I have seen instances where, you know, even on those aggregators that I was referencing earlier, their web pages will specifically call out Liberty Mutual Insurance Company on their consent page, so. . .
**Q Okay. Yeah, and if the -- if Liberty Mutual is called out on the consent page that's stored with Jornaya, then, you know, that information would be at Liberty's fingertips through the Jornaya portal, right?**
A Potentially. There are, yes, if in fact that Liberty Mutual is hard coated on their consent page, yes.
**Q What do you mean by hard coated?**
A So, for instance, some consent pages may have a phone number that could be dynamically derived. That would not be a hard-coated text element on their page.
So in the cases where Liberty Mutual would be a hard- coated text element, then, yes, it would be in the Jornaya portal in that manner.
**Q Does Liberty Mutual keep track of the web pages that are hyperlinked from consent language such as what we were looking at on page LM 53 in Exhibit C?**
A No, we leverage Jornaya's services.



**Q Well, Jornaya doesn't keep track of it either, right?**
A I was saying we -- sorry. To clarify, we leverage Jornaya's services for consent.
**Q Okay. But Jornaya doesn't keep track of web pages that are hyperlinked from language like what we're looking at in Exhibit C, page 53, right?**
A To my knowledge they don't.
**Q Okay. All right. So if neither Liberty nor Jornaya keeps track of the marketing partners or in Exhibit C provider network that is hyperlinked in consent language, how can Liberty Mutual be sure that whatever hyperlink is present mentions Liberty Mutual?**
A That would typically be caught at the time that a -- that language is approved. Again, like I mentioned earlier, I haven't seen a time where Liberty Mutual hasn't been listed on a hyperlinked page, but. . .
**Q So are you saying that Liberty Mutual not only approves the consent language in Exhibit C, but that it also approves the provider networks, or sometimes referred to as marketing partners, like what we're looking at in Exhibit D?**
MR. MALLOW: Objection. Vague.
A Yeah, could you please clarify that? Sorry. Just want to make sure I understand.



**Q Yeah, I mean, so you testified earlier that Liberty Mutual approves the language like what we're looking at in Exhibit C, page 53, and what I'm asking is whether Liberty Mutual approves the pages that are hyperlinked from that consent language like what we're looking at in Exhibit C?**
A We don't typically approve the page. We would typically review the page to confirm Liberty Mutual's name is present.
**Q Okay. And who would do that at Liberty Mutual?**
A That would typically be at the time that language is put in front of us. So I believe that -- yeah, I'm trying to recall at this time if that would either have been someone on, like, our legal team or even someone on my team checking to confirm that we saw the expected text.
**Q Is there somebody at Liberty Mutual that sort of keeps track of the hyperlinked provider network/ marketing partners' --**
A No.
**Q -- web pages approvals?**
A Sorry. No.
**Q Does Liberty Mutual have any way to verify what provider network or marketing partner hyperlinked web pages looked like at the time of any particular lead?**



MR. MALLOW: Objection. Vague.
A So you're asking whether or not Liberty Mutual can confirm what the hyperlink page looks like at the time that a lead is purchased?
**Q That's right.**
A Yeah, I don't know that we'd have a mechanism to confirm that.
**Q Okay. And if Liberty doesn't have any formal relationship with Core Digital or LowerMyBills, how does it come to be that Liberty is listed as a provider network member?**
A It's usually that they recognize the potential buyers of their -- of their leads and would list them here.
**Q Okay. Did Liberty ask Core Digital to place its name on Core Digital's provider network websites?**
A No.
**Q Why are the -- do you have any understanding, Mr. Hemker, why the list of purported network providers or marketing partners oftentimes appears in a hyperlink rather than on the consent page itself?**
A My understanding of why they may utilize a hyperlink page would be because there may be difficult to display on the original consent page.
**Q Okay. And is that because there are just so many**

Page 34

entities that are purported network providers?
A I would assume so.
Q Does Liberty Mutual consider itself a network provider of Core Digital?
MR. MALLOW: Objection. Vague.
A It looks like it's referred to as a provider network, and they're listing out the potential parties that they could sell to.
Q Do you understand Liberty Mutual to be a formal member of Core Digital's provider network?
MR. MALLOW: Objection. Vague.
A I would consider Liberty Mutual having a partnership with All Web Leads, and All Web Leads having a partnership with Core Digital.
Q Okay. And All Web Leads, I think, is listed here. So are you saying that your understanding is that Core Digital is a partner with both?
A Yes.
Q Explain.
A Sorry. What I -- what I mean by that is Core Digital sells leads to All Web Leads directly, and Core Digital recognizes that those leads could be sold to Liberty Mutual through All Web Leads.
Q Okay. And so my question remains. Does Liberty Mutual consider itself a member of Core Digital's

Page 35

provider network?
MR. MALLOW: Objection. Vague. Go ahead.
A In this case, yes.
Q Okay. And so what's the agreement between Liberty Mutual and Core Digital that specifies that Liberty -- that Core Digital is a member of -- I'll start over. I kept messing that up.
MR. MALLOW: And the way you're asking, it's going to be argumentative, so you may want to think about how to ask that question so I don't have to object.
Q Okay. So is there any sort of formal, informal, or other kind of agreement between Liberty Mutual and Core Digital that says that Liberty Mutual consents to be part of Core Digital's provider network?
MR. MALLOW: Objection. Vague and compound. Go ahead if you can.
A Liberty Mutual has contracts with All Web Leads, and I would -- my understanding would be that the -- my understanding would be that the -- sorry; I'm trying to think how to say this -- that the connection would be made through that agreement giving Core Digital the rights that were referenced, but that is -- that's my understanding.
Q All right. But my question is is there any

Page 36

agreement whatsoever, written or other, between Liberty Mutual and Core Digital whereby Liberty Mutual consents to be part of Core Digital's provider network?
MR. MALLOW: Objection. Asked and answered.
Q It's just a "Yes" or "No."
MR. MALLOW: Again, objection. Asked and answered and vague. Go ahead. It's whatever you think, yeah, please.
A I don't know that we have an existing relationship with Core Digital. I could look back through our contracts, though, because there may be one from sometime in the past. I don't know if it's even open at this point. I can say that our contract is direct with All Web Leads, though.
Q Okay.
MR. MALLOW: Alex, we've been going about an hour, hour and three. Do you want to take a break?
MR. BURKE: Yeah, let's take five minutes. Is that good with everybody?
THE WITNESS: Yep.
MR. MALLOW: Just so we're all lined up, why don't we come back at the quarter past the hour.
MR. BURKE: That's fine.
MR. MALLOW: Okay.

Page 37

VIDEOGRAPHER: Video time on the monitor is 10:07 a.m., and we are off the record.
(A SHORT BREAK WAS TAKEN)
VIDEOGRAPHER: The time on the monitor is 10:15 a.m., and we are back on the record.
MR. BURKE: Thank you.
(PLAINTIFF'S EXHIBIT E MARKED)
Q All right. Coming back from a break, I've placed a document I've marked as Exhibit E on the screen share, and this document is "Liberty Mutual's Responses to Plaintiff's First Set of Interrogatories."
Do you have any familiarity with this document?
A I don't know that I've seen this document.
Q Okay. So do you know what an interrogatory is as a general matter?
A Would you mind explaining it?
Q Yeah, so an interrogatory is a discovery tool in a lawsuit where one party can ask for written answers to relevant questions of another party.
And so here the Plaintiff, I, asked Liberty Mutual to answer a series of questions in writing, and I'm going to direct your attention to interrogatory 2 on Exhibit E. And that interrogatory says, "Identify all policies, practices, and procedures implemented by you or anyone else in order to independently verify that

Page 38

the information you use to make prerecorded message calls, (for example, lead or opt-in information), is true and correct and the result of a true opt-in."
My question is we've been talking about some of the answers -- some stuff that might provide part of the answer to this interrogatory today, haven't we?
A Yes, I believe so.
Q Okay. And so I want to go through the response, and there are some objections here that, you know, I think that we can skip through for purposes of this morning. So I want to direct your attention to the top of page 7 of Exhibit E where we start providing facts.
So would you agree that it appears Liberty Mutual is providing a response to this interrogatory with regard to the 5098 telephone number?
A Yes.
Q All right. And that that -- that the lead that Liberty Mutual received that included that phone number came from All Web Leads; is that your understanding?
A That's correct.
Q All right. And then the interrogatory response goes on to say that the lead generator for that lead was Core Digital. Is that accurate as far as you know?
A As far as I know.
Q And then the response says that, "Liberty has an

Page 39

agreement with All Web Leads, which will be produced by Liberty Mutual."
Do you see that?
A Yes.
(DEFENDANT'S EXHIBIT F MARKED)
Q Directing your attention to Exhibit F, which I've just placed on the screen, Exhibit F is 15 pages long and has Bates label LM 1 through LM 15 consecutive. Okay?
A Yes.
Q Are you familiar with Exhibit F?
A Yes, in a general sense. It's been a bit since I've looked at, I think, this agreement, but it does -- it has similarities with a number of our agreements.
Q Okay. Do you have an understanding that this agreement is between All Web Leads and Liberty Mutual having to do with lead aggregation?
A Yes.
Q Okay. And is this the contract that controlled the relationship between All Web Leads and Liberty Mutual between 2017 and the present?
MR. MALLOW: Objection. Lacks foundation. Alex, maybe you can let him look through the document before, --
MR. BURKE: Yeah.

Page 40

MR. MALLOW: -- make sure it's an accurate answer. I don't want you to have a messy record.
THE WITNESS: Yeah, thank you.
Q I'm just scrolling through this document, Exhibit F, so you can review it.
A Thank you.
(WITNESS REVIEWS DOCUMENT)
Q Okay. We're finished scrolling through, and my question is is it your understanding that Exhibit F governs the relationship between Liberty Mutual and All Web Leads between 2017 and the present?
A Yes.
MR. MALLOW: Okay. I was going to say I had an objection that I wanted to put in, which is I think these -- I'm trying, Alex, to give you some latitude, but remember this is a -- a 30(b)(1) on consent, not necessarily agreements between AWL and Liberty Mutual. So as long as you can tie it to the consent, I get it. And I'm trying to be flexible, but remember this is a specific-topic deposition.
So the witness has answered, so I'm not going to move to strike that answer; but try to keep it within the scope of the topic, please.

Page 41

MR. BURKE: Yeah, so, I mean, the origin of this question is Liberty Mutual's response to interrogatory 2 in Exhibit E where Liberty Mutual commits to producing a contract between Liberty Mutual and All Web Leads, and I'll represent to you that this is the only contract that Liberty Mutual has produced in this action; and Liberty Mutual elected to make this contract be the first document in all of its productions for this entire case.
MR. MALLOW: I understand that, but he's not a 30(b)(6) witness. He did not sign these interrogatories. So, again, try to keep it just tethered to the consent questions.
Q Scrolling down to page LM 7, I'm showing you here there is a reference to John Fogarthy, Segment Manager, USLM [sic] Partnerships." Do you see that?
A I think it says "US" -- I think that's "CM."
Q Okay. Do you have an understanding of what USCM would be?
A Actually, I'm wondering if my interpretation of that letter is accurate or not. (CHUCKLES). But, yeah, no, I'm sorry; it is. U.S. Consumer Markets. Apologies.
Q I see.
A We no longer use that term, so apologies.

Page 42

Q Do you know John Fogarty?
A Yes, he's a former manager of mine.
Q And is John Fogarty still at Liberty Mutual to your knowledge?
A Yes.
Q And what is Mr. Fogarty doing generally today at Liberty Mutual?
A He works for our Strategic Partnerships group.
Q And does that Strategic Partnerships group include work with lead aggregators or lead generators?
A Not anymore with maybe one exception being that there are some lead generators -- or lead aggregators that are licensed to sell Liberty Mutual products.
Q Okay. And just directing your attention to the last page of Exhibit E, the interrogatory responses, there's a signature of a person named "Michael Wettergren." Do you see that?
A Yes.
Q Do you know Mr. Wettergren?
A Yes.
Q What does Mr. Wettergren do at Liberty Mutual generally?
A He's a director on my team.
Q So Mr. Wettergren reports to you?
A That's correct.

Page 43

Q Now, what generally are Mr. Wettergren's duties at Liberty Mutual?
A Mr. Wettergren oversees some of our lead aggregator programs.
Q Okay. Which lead aggregator programs does Mr. Wettergren oversee?
A Those that deal with the data lead purchases and call programs generated off of data leads.
Q Okay. Okay. So would you agree with me that with regard to the leads that we've been talking about where the lead is bid on and purchased from a lead aggregator like All Web Leads, that would be a lead sale or a lead sales lead as referenced in Exhibit F?
A Yes, I would agree with that.
Q Okay. And so then on page 1 of Exhibit F, there's a reference as to lead sales lead to Exhibit B, right?
A Yes.
Q If we scroll down to Exhibit B, I would expect to see criteria for the leads for lead sale leads. Would you agree with me that Exhibit B provides the criteria that Liberty Mutual requires for leads for the lead sale process that we've been talking about today whereby leads are bid upon and if purchased, sent to Drips for prerecorded message calls?
MR. MALLOW: Objection. Vague and lacks

Page 44

foundation.
A I would agree that this is criteria that was set forth at the time that this agreement was signed.
Q Okay. And so the criteria in Exhibit B does not include any criteria relating to TCPA consent; would you agree?
MR. MALLOW: Objection. Document speaks for itself. Lacks foundation. Go ahead.
A Correct. I would agree that Exhibit B does not specifically refer to TCPA consent.
Q Well, I mean, I'm asking something more than that. Wouldn't you agree that page 11, Exhibit B to Exhibit F, does not reference any sort of lead criteria that has anything to do with TCPA consent?
MR. MALLOW: Objection. Document speaks for itself. Go ahead.
A Yeah, these pages don't.
Q Okay. I mean, are you aware of any relation -- any agreement between Liberty Mutual and All Web Leads that has to do with consent?
A Can you scroll up to the "Compliance with Law" section of this document?
Q Are you referencing paragraph 5.2?
A Correct.
Q Okay. It's showing on the screen for you.

Page 45

A Yes. This would be the section of our agreements that speak to not just TCPA, but also any applicable federal, state, and local law -- or local statutes, laws, regulations, rules, judgments, orders, etc.
Q Okay. And so does the TCPA apply to All Web Leads in a lead sales context?
MR. MALLOW: Objection. Lacks foundation. Beyond the scope of the deposition. Go ahead.
A It's my understanding that TCPA would apply to anyone, at least -- go ahead.
Q Well, the TCPA applies to folks that are making calls, right?
A True.
Q Okay. And as to the lead sales agreement portion of this contract, All Web Leads isn't making any calls, right?
A Not in reference to the lead sales; correct.
Q Okay. And so wouldn't you agree with me that if All Web Leads sent fake leads or invalid leads to Liberty Mutual pursuant to this contract, paragraph 5.2 just wouldn't prohibit that?
MR. MALLOW: Objection. Vague. Incomplete hypothetical. Lacks foundation.
A Yeah, I wouldn't agree with that.
Q Tell me why 5.2 would require All Web Leads to

provide valid leads to Liberty Mutual?
A From a business context there's an understanding that anything that Liberty Mutual purchases from All Web Leads would be compliant.
Q Okay. Is there a contract that says that or some written agreement?
A That's how this would be interpreted.
Q Well, what about this paragraph that says -- well, let me ask you this.
If All Web Leads provided invalid or fake leads to Liberty Mutual for lead sales, what would be illegal about that?
MR. MALLOW: Objection. Lacks foundation. Vague. And it's beyond the scope. Come on, Alex. Ask questions that are appropriate for this witness.
Q Please answer.
MR. MALLOW: If you know.
A Can you rephrase? I didn't understand the question.
Q What about paragraph 5 -- well, I'll ask it this way.
What law requires All Web Leads to provide only valid leads to Liberty Mutual?
MR. MALLOW: Objection. Vague. Beyond the scope and lacks foundation.


A I would refer to my prior answer that it is understood between the business relationship that All Web Leads has with Liberty Mutual that we will only be receiving compliant leads.
Q Okay. And so compliant with what?
A First of all, TCPA.
Q Okay. What else?
A Anything -- any other applicable federal, state, local statutes, laws. So if there is an additional law that were to come on the books after this agreement is signed, then it would be understood that such sale would fall under those.
Q Okay. So I'm asking whether there's a written agreement between Liberty Mutual and All Web Leads that you know of that requires leads to be valid?
MR. MALLOW: Objection. Asked and answered.
A Yeah, I'm sorry. I don't know how to say it any other way, Alex. That is how this paragraph is understood between the business relationship between Liberty Mutual and All Web Leads.
Q Okay. And are you aware of any other contracts other than -- or agreements other than Exhibit F and specifically 5.2 that require All Web Leads to provide only valid leads to Liberty Mutual?
A I'm not.


Q Okay. All right. So going back to Exhibit E, the interrogatory responses, we just talked about the agreement with All Web Leads referenced in this interrogatory. The next thing it says -- the response says is that "Liberty Mutual has established certain criteria that every lead must satisfy before it is purchased by Liberty Mutual."
Do you see that?
A Yes.
Q All right. Then it says, "All Web Leads authenticates consumer information."
Is it your understanding that that statement is correct?
A That's my understanding.
Q What does All Web Leads do to authenticate consumer information?
A It's my understanding that All Web Leads leverages a service that helps them in authenticating consumer information.
Q What sort of service? What do you mean?
A It's my understanding that they leverage a service, I believe, by the name of Neustar to help in the authentication of consumer information.
Q Okay. And is any of that authentication data from Neustar or anyone else provided by All Web Leads to


Liberty Mutual?
A No, I believe it's an action they take of their own accord.
Q Okay. Here we have -- the next phrase in this sentence references "Liberty Mutual's criteria."
Would you agree that that reference goes back to Exhibit B of Exhibit F that we reviewed earlier as far as criteria?
A Yes, it's possible that phrase could be in reference to the Jornaya service referenced earlier as well.
Q Okay. But you don't know?
A I don't know. Again, from a technical standpoint it could apply to both.
Q Right. I'm just asking whether you know whether it does or does not apply, and I think you're saying you don't know?
A I don't know, but I am saying it could apply to both because both are criteria set forth by Liberty Mutual.
Q Okay. And then we're coming up to this sentence dealing with LeadCloud. And you testified a little bit about LeadCloud earlier, right?
A Correct.
Q What does LeadCloud do?
A LeadCloud provides an integration between Liberty Mutual and the lead aggregator and other services like

Page 50

Drips and Jornaya and even Liberty Mutual's internal systems.
(PLAINTIFF'S EXHIBIT G MARKED)
Q Okay. And so I placed on the screen what I've marked as Exhibit G. This is a 10-page document Bates stamped LM 29 through LM 38. Are you familiar generally with this document, Exhibit G?
A Generally.
Q Okay. Do you believe that Exhibit G is the contract between Liberty Mutual and LeadCloud referenced in Liberty Mutual's response to interrogatory 2 in Exhibit E?
A I believe so.
Q Great. So the contract in the "Whereas" clause says that, "Liberty Mutual wishes to engage Lead Provider," which is defined as LeadCloud, LLC, "to assist Liberty Mutual in identifying persons to whom Liberty Mutual may wish to market its products and services through Lead Sellers that will be integrated into the LeadCloud Platform."
Would you agree that that "Whereas" clause accurately describes the relationship -- at least part of the relationship between Liberty Mutual and LeadCloud as to the lead aggregator, lead generator, Drips, prerecorded calls, marketing campaigns that

Page 51

we've been talking about this morning?
A Yes.
MR. MALLOW: Objection. Vague.
Q So paragraph 1b of Exhibit G defines a "Lead" on Exhibit A of this document, so I'm going to scroll down to Exhibit A.
(MR. BURKE SHOWS EXHIBIT A OF EXHIBIT G ON THE SCREEN)
Q So Exhibit A to Exhibit G is on Bates 37; would you agree?
A I'm sorry. Did you say page 37?
Q Bates page 37.
A Sorry. I'm not familiar with that term. I apologize.
Q So, like, lawyers use these numbers in the lower right-hand corner to keep track of documents across all documents that they share with one another in a litigation like this, and so I'm trying to be consistent and refer to these "Bates numbers."
A Ah.
Q And if you look, you'll see that, like, they're consecutive in this document.
A And your question was with respect to Exhibit A being 37 to 39 -- Bates 37 to 39?
Q I think Exhibit A to Exhibit G is just one page, 37.
A (CHUCKLES). I'm sorry. Alex, can you rephrase the

Page 52

question? Apologies.
Q Yeah, I'm just trying to like --
MR. MALLOW: Maybe just run off the PDF numbers, 9 of 10. That might expedite this.
Q All right. So "Exhibit A, Lead Sales Agreement" is on PDF page 9, which is Liberty Mutual 37, right?
A Yes.
Q All right. And this Exhibit A sets forth the criteria that Liberty Mutual directed LeadCloud to use with regard to Jornaya, right?
MR. MALLOW: Objection. Document speaks for itself, but go ahead.
A Yeah, I think this is intended to speak to the overarching agreement with LeadCloud, and it just has -- it has some Jornaya references in there.
Q Okay. Would you agree that Exhibit A to Exhibit G accurately and completely describes what LeadCloud does with regard to Jornaya as to the lead sales portion of the relationship?
MR. MALLOW: Objection. Vague and compound. Go ahead.
A I'm going to read this if you don't mind, Alex.
Q Of course.
(WITNESS REVIEWS DOCUMENT)
A Yes. Yes, it does appear that way.

Page 53

Q Great. So directing your attention to the second paragraph, it says, "LeadCloud will push all leads received from all Lead Sellers through the Jornaya system on Liberty Mutual's behalf to confirm whether the TCPA language matches what Liberty Mutual has on file for that Lead Seller."
Would you say that's an accurate explanation of what LeadCloud is doing with regard to Jornaya?
A Yes.
Q All right. And so the reference to -- well, the reference to Lead Sellers in Exhibit A of Exhibit G, those are lead aggregators, right?
A That's my understanding.
Q Okay. And so the specific directive that Liberty Mutual gave to LeadCloud is to confirm whether the TCPA language matches what Liberty Mutual has on file for that Lead Seller. Would you agree?
A Yes, I would also direct to the last line of the paragraph above that references TCPA compliance in general.
Q Oh, okay. Directing your attention to that phrase, "Leads will be scored by Jornaya for TCPA compliance," what does that mean, "scoring for TCPA compliance"
A It's the check against the parameters that we discussed earlier.

Q Okay. And so does -- what comes back from Jornaya with regard to scoring? Is it just a binary, you know, thumbs-up, thumbs-down, or is there some sort of score?
A No, that scoring is referencing the binary accept or reject that we referenced earlier.
Q Okay. And what this is referring to is checking the Jornaya records to see if Jornaya's record of the TCPA compliance language for the website matches the TCPA compliance language that Liberty Mutual approved previously and which Jornaya stores on its -- on its systems and is available through the portal?
A That would be a part of it.
Q Okay. Tell me what else.
A So it's not just the language itself; but as I mentioned, you know, there would be a requirement for the video playback. We would also reject if in fact a lead was generated by a call center, meaning not necessarily a person sitting in front of their computer expressing consent themself, but a call center doing it for them; and the other parameters that were referenced earlier like the lead age, and so it's not just the actual TCPA language. There are other dimensions or parameters that Jornaya has access to.
Q Well, let me ask you this. I mean, does Liberty Mutual have a way to determine whether the person who



entered information onto a lead generator's website is actually the person whose information is being entered?
MR. MALLOW: Objection. Vague.
A Liberty Mutual -- we rely on Jornaya's service to ensure we have consent. It's incredibly difficult to know 100 percent sure that the person who we're told is raising their hand for an insurance quote that all of that information is 100 percent accurate.
Q Okay. I mean, isn't it true that Liberty Mutual doesn't have a way as a general matter to confirm whether the demographic information being entered on a lead generator website is true and correct as to the person who is entering it?
MR. MALLOW: Objection. Vague. Lacks foundation.
A I think I understand your question. Could you rephrase?
Q I mean, is there any way to tell whether -- for Liberty Mutual to tell whether the person who entered information into a lead -- a generator website is the same person whose information is being entered?
A No, I don't think we have that capability of doing so ourselves.
Q Does anybody have that capability?
A I don't know.



Q I mean, what are the -- are there -- okay.
So going back to Exhibit E, the interrogatory, Liberty Mutual says that LeadCloud does a bunch of other stuff in this panel to mid sentence on page 7 of Exhibit E; for example, "Confirming valid consent via Jornaya, confirming any prior litigation involving TCPA consent, Do Not Call registry status," and others.
Do you have an understanding as to whether LeadCloud does those things for Liberty Mutual?
A Yes.
Q Does LeadCloud provide the services that are listed in this interrogatory to Liberty Mutual as a general matter?
A Yes.
Q Okay. And has that been the case throughout the relationship between LeadCloud and Liberty Mutual as far as you know?
A I think certain components of this have been added, but with respect to, like, the "Do Not Call" registry status, the validation details related to the vehicle, certainly the valid TCPA consent piece, yes; but for I would say most of the relationship that we've had with Jornaya [sic], all of this has been in place.
Q And your relationship -- Liberty Mutual's relationship with LeadCloud, right?



A I'm sorry. I meant LeadCloud. Apologies.
Q Okay. All right. Great.
What does prior litigation involving TCPA consent have to do with whether there was consent for a particular lead?
A So we are only interested in consumers who are truly looking for insurance, and those who have had prior litigation involving TCPA consent are unlikely that they're actually shopping for insurance.
Q Okay. And "Do Not Call" registry status, I mean, does that have to do with consent?
A Yes, that would have to do with consent.
Q Tell me what DNC registry status has to do with consent to receive prerecorded messages.
A If they've previously opted out from us reaching out to them through prerecorded messages, then we would not want to purchase that lead.
Q And if -- if LeadCloud is evaluating these leads before it accepts them, that suggests that LeadCloud has the lead information such as the phone number before it pre-purchased; would you agree with that?
A Yes.
Q Okay. My understanding of the lead-generation industry is that as a general matter, on the ping only skeletal information concerning a lead is provided.

Would you agree with that?
A As a general rule --
MR. MALLOW: Hold on a second. Objection. Beyond the scope. Lacks foundation. Now you can answer.
A As a general rule I would agree with that, but we do have the ability to reject on the post.
**Q I see. So would you just explain ping and post and how that works with LeadCloud and All Web Leads and the other lead aggregators and Liberty Mutual?**
A So it is a complicated one admittedly, so apologies in advance. But ping would be when certain demographic information, things like number of vehicles or home ownership or some of those other filters that are referenced in the agreement here are checked so that that data is typically offered up on a ping to get a -- an initial bid back from a lead buyer.
Then additional checks after -- so sorry. Let me take a step back.
If the lead buyer's bid is acceptable to the seller, then the lead would be posted to the lead buyer, in this case through our LeadCloud technology, and we would have an opportunity to reject the lead based off of that posted data, which often includes more information on the consumer like their phone number and



their name and their address. That's when a Jornaya rejection could come about -- actually, I might have to double-check on that. We may actually be able to do the Jornaya rejection on the ping. But nonetheless, a DNC check can be completed on the post because of the presence of a phone number.
**Q Okay. And just sort of big picture, isn't it accurate to say that the ping happens before the bid and the sale?**
A The ping is the first step.
**Q Okay. I mean, the purpose of the ping is for Liberty Mutual through LeadCloud to get an idea of what this lead is all about, right?**
MR. MALLOW: Objection.
A Correct.
**Q And then once Liberty Mutual through LeadCloud makes a decision as to whether it wants to bid, if that bid is accepted by All Web Leads or the lead aggregator, then the full lead information is provided to Liberty Mutual through LeadCloud; that's the post, right?**
A That's correct.
**Q All right. Who keeps track of the lead information received on the post for Liberty Mutual?**
MR. MALLOW: Objection. Vague. Go ahead.
A Sorry. I'm trying to confirm the --



**Q Well, what I'm getting at is, I mean, does Liberty Mutual have any way of keeping track of what phone numbers are called through Drips?**
A So Drips can certainly assist in that effort.
**Q Okay. And then -- and Liberty Mutual has a portal -- a log-in for the Drips portal, right?**
A That's correct.
**Q And Liberty Mutual can run queries on the call data that Drips has as to the calls Drips made on behalf of Liberty Mutual, right?**
MR. MALLOW: Objection. Vague. Go ahead.
A That's correct.
**Q Okay. And so what happens to the lead information received from the aggregator through LeadCloud after the lead is posted to Drips? Is it deleted? Is it archived or what?**
MR. MALLOW: Objection. Vague. Go ahead.
A Are you asking what does Drips do? What is your --
**Q No, I'm asking -- yeah, yeah. I'm just wondering about, like, the lead data itself. The demographic data that's purchased from the lead aggregator like All Web Leads, what happens to that data?**
A So the data would flow to Drips. Well, let me take a step back.
The initial -- when the data comes in through



LeadCloud, LeadCloud would run a check against Liberty Mutual's -- Liberty Mutual's system that would generate an estimated rate for the consumer. That estimated rate would be sent over to Drips. And then Drips would start the -- the interaction with the consumer that would include, you know, the data that came over from LeadCloud like their phone number and even that -- that estimated rate that LeadCloud received back from Liberty.
**Q When Liberty Mutual comes up with that initial quote for insurance based upon the lead sale information for the lead, after it -- after it performs that analysis you described, what does Liberty do with the consumers' information, the lead information? Does it go into a database?**
A It would be contained within a database so that when the consumer speaks to our representative that the process is seamless for the consumer. They were raising their hand for a quote online. They speak with us, and we're able to recall that quote for them.
**Q And what is the system called that maintains that data?**
A It would just be our electronic data warehouse.
**Q Okay. And then you mentioned a call center. What were you referring to in that last answer?**

Page 62

A We have a direct center that receives the phone calls that are generated off from these efforts.
Q **Okay. So is it accurate to say that the Drips prerecorded message calls direct the consumer to call back at a particular toll-free number?**
A The Drips interaction is asking the consumer what time is best for them.
Q **Okay. And it includes a call-back number as a general matter, doesn't it?**
A Correct.
Q **Okay. And that call-back number is unique to the lead -- to the particular website where the lead was generated; isn't that true?**
MR. MALLOW: Objection. Vague.
A No, the phone number would be unique to the aggregator and the campaign with the aggregator.
Q **What do you mean "the campaign with the aggregator"?**
A So we may have one campaign with an aggregator designated for customers with multiple vehicles, so that's -- we would -- we would split that up into a separate campaign from another campaign that would be customers with single vehicles for analytics purposes.
Q **And --**
COURT REPORTER: I'm sorry. I'm sorry. For what purposes?

Page 63

THE WITNESS: Analytics purposes.
COURT REPORTER: Okay. Thank you.
Q **And does Liberty Mutual make prerecorded marketing calls through Drips as to other types of insurance other than auto?**
A Only auto and home.
Q **Okay. And when you say "home," that means homeowners?**
A Homeowners, single-family dwelling, insurance specifically.
Q **Okay. And other than, you know, pitching for a particular type of service or insurance, is there any difference in the policies or procedures or the other stuff that we've talked today -- talked about today with regard to auto versus homeowners?**
A No, I don't believe there would be a difference.
Q **Okay. So back to the call center, say, for example, consumer receives a prerecorded message from Liberty Mutual called by -- initiated by Drips, and they call the toll-free number back -- the toll-free number from the prerecorded message, where does that call get routed as a general matter?**
A It would be routed to our virtual call center.
Q **Okay. And you said "virtual call center." What's virtual about the call center?**

Page 64

A We have representatives in Orlando, Phoenix -- I think actually Chandler, Arizona; and Plano, Texas. Our telephony system is virtual.
Q **Okay. So at any given time there are up to three call centers handling these inbound calls that were generated through Drips's outreach; is that right?**
A That's correct or one of multiple marketing sources.
Q **Okay. And so are the folks who handle those inbound calls, are they Liberty Mutual employees?**
A That's correct.
Q **And the operators that handle those calls, do they have access to information from the electronic data warehouse so that they can speak intelligently about the consumer and the initial quote that was provided in the SMS?**
A Yes, they would have access to that initial quote for the purposes that you referenced to be able to speak intelligently to the customer about that.
Q **Okay. And I would assume that those operators have a computer program in front of them as they speak with the folks who called back; is that right?**
A Yes.
Q **Okay. What is that program called? What is that interface called that the operators use when they're interacting with call-backs?**

Page 65

A That would be our CSW system, Customer Service Workbench.
Q **And is the CSW system, is that part and parcel with the electronic data warehouse, or is it -- you know, does it interact with the data warehouse and only contains some of that data?**
MR. MALLOW: I'm -- you can answer after I object, but I'm objecting as this is beyond the scope of the topic of the deposition; but we'll deal with that later, Alex.
You can answer if you can.
A It does interact with our electronic warehouse and pulls the relevant "information" up so that our representative can speak effectively to that customer.
Q **Okay. And so the operators using the CSW system, do they have a directive from Liberty Mutual to keep track of what happens during those interactions where a consumer calls back?**
MR. MALLOW: Objection. Vague.
A Can you clarify?
Q **So, like, oftentimes I've seen in a call center there's a system, like, the CSW maybe where the operator has drop-down boxes and maybe free-form notes they're able to write about what happened in the interaction between the operator and the consumer who**

Page 66

called in. And so my question is is there something
like that in the CSW system?
MR. MALLOW: Objection. Go ahead.
A Most of our notes are automatically generated by the system.
Q Okay.
A Our representatives don't have -- I don't know if you're referring to, like, a disposition or some sort that they would choose at the end of a call.
Q Yeah. So, like, if a consumer says, "Hey, quit calling me," I mean, is there a way for the operator to, you know, keep track of that?
MR. MALLOW: Object to the scope again.
A So my understanding is that doesn't happen very often because of the opt-out option that we have already prior to that both with respect to the prerecorded messages as well as the SMS that goes out.
But if -- if presented with that, a representative would typically check off -- we have a do-not-contact option within our CRM, and in that case it would cease any additional marketing to that consumer.
Q Okay. And you mentioned a opt-out mechanism, and I'm wondering what you're referring to? The --
A Within -- sorry. Sorry. Go ahead.
Q The script of the prerecorded messages that I've

Page 67

seen say to call the toll-free number to opt out.
A The script that I've seen provides a key-press option to either connect with us, to opt out, or to schedule a call-back.
Q Okay.
A You asked -- go ahead.
Q How about the prerecorded message script?
A That's what I was referring to.
Q So the -- so -- let me -- I don't understand what you're saying; I don't think. So when a consumer picks up the phone, and there's a prerecorded message that says, "Hey, this is Liberty Mutual; we've got a quote for you; please call us back at 844" whatever, how does the consumer -- how does the consumer opt out when they receive that call?
A It's my understanding that the prerecorded message would introduce the Liberty Mutual brand and would give the consumer the option to press -- to make a key press to speak with us now, to opt out, or to schedule a call-back at a different time.
Q I see. And the Drips prerecorded message calls are programmed to leave voicemails if the voicemail picks up; isn't that right?
A I think -- yeah, go ahead.
Q You can answer.

Page 68

A My understanding is that the message doesn't have -- or I'm sorry -- that the Drips system doesn't have the ability to recognize if it's a human or if it is a voicemail, and so the message will play at the moment that the phone is picked up whether it's a human or if it's voicemail.
Q I see. Okay. And it would be the same message as far as you know regardless of whether it's a human or a voicemail; is that right?
A That's my understanding.
Q Okay. Does Liberty have any way of keeping track of folks who tell Liberty that they never opted in to receive prerecorded calls?
A We maintain a master do-not-call list, --
Q Okay.
A -- and Drips -- Drips would hold that.
Q Okay. What about the situation where a consumer contacts Liberty Mutual and says, "Hey, why are you guys calling me? I never asked for these prerecorded calls;" is there any way -- you know, how would Liberty Mutual internally respond to such an interaction?
A It's my understanding that we have an escalation process in that case.
Q Okay. And so tell me about that escalation process. How does that go down?

Page 69

A Typically the representative would direct it to their supervisor, and we have regular touch points with the supervisors where we can hear trends from those supervisors. If they're saying one campaign is better performing than another, that's an avenue where we can hear some of those trends.
But sometimes supervisors will reach out to us directly, or we have what's referred to as our presidential sales [sic] team that fields any kind of complaint. It can be escalated to that. And then we would be notified -- my team would be notified, and we would ensure that our do-not-call list is updated.
Q And has that ever happened?
A We've had that happen, yes.
Q Okay. And so where would records of that having happened, where would those be? Maybe on email?
A I'm not sure. They happen very infrequently. So it's not something that we would -- unless it's a situation like this where there is a suit that is filed, that's the only type of email that we would retain. But our -- our process are alerted. We would immediately submit a DNC request into Drips so that the list would be updated. And that consumer, if they haven't already opted out, we would be ensured that they are opted out going forward.

Q And so I'm trying to figure out where the record of this or complaint would be. So the operator receives the call with the complaint. They contact their supervisor. And then what does the supervisor do with the information concerning the complaint? Do they put it into slack? Do they send it in an email? Is there another system? How do they communicate that to the folks that deal with complaints?
A If it would go through the escalation process that I was referencing, we have an email box that our presidential service team maintains.
Q Okay. Anyplace else?
A I don't know of another -- I can't think of another place right now on that.
Q Okay.
MR. BURKE: Michael, let's take another quick break maybe to 11:30. Everybody okay with that?
MR. MALLOW: Let's -- why don't we go off the record first so this way we're not doing it on time. And then I know we have -- I think -- well, let's do the -- go off the record first, --
MR. BURKE: Okay.
MR. MALLOW: -- you and Alex.
VIDEOGRAPHER: All right.
VIDEOGRAPHER: Are we off? Well, okay.



VIDEOGRAPHER: The time on the monitor is 11:23 a.m., and we are off the record.
(A SHORT BREAK WAS TAKEN)
VIDEOGRAPHER: The time on the monitor is 11:36 a.m., and we are back on the record.
Q Back from a break. Thanks, Everybody.
Mr. Hemker, earlier in your testimony you referred to a presidential sales [sic] team. Didn't you mean to refer to presidential services team?
A Yes, that's correct.
Q Okay. And you referred to the CSW system earlier. Would it be accurate to say that the CSW system is Liberty Mutual's CRM for keeping track of prospective customers?
A Yes, that's correct.
Q Does the same CSW system keep track of existing customers?
A Yes, that's correct.
Q Okay. We talked a lot about outbound calls being sent to Drips to play prerecorded messages. I just want to close the loop on this. Are there any other companies that make marketing prerecorded messages for Liberty Mutual?
A No, not for my programs.
Q Okay. And so to your knowledge no one other than



Drips has made outbound marketing prerecorded messages calls since 2017; is that right?
A Can you rephrase?
Q As far as you know, nobody but Drips has made outbound prerecorded marketing calls for Liberty Mutual, right?
MR. MALLOW: Objection. Beyond the scope. Go ahead if you know the answer.
Q Since 2017?
A Since 2017, I would have to look at that for my programs, Alex. We used to have another company maybe in 2017, but I'm not sure when we had them or when we paused them; but I can tell you definitively 2021, it was solely Drips for our marketing programs.
Q What was the other company that might have made some calls within that time period?
A If we -- if they were, it would have been Consumer Solutions Group, CSG.
Q And is there a predecessor to LeadCloud? I see the LeadCloud contract, which is -- golly -- Exhibit G is dated 2018.
A I -- I don't believe that there was. I think that's part of the reason why I'm fuzzy on the CSG reference.
Q Okay.
A My dates -- apologies. A little fuzzy on years --



Q Okay.
A -- on that.
Q And just directing your attention back to this list of provider network, I'll put this exhibit back up, Exhibit D. So this list of provider network is 45 pages long, and I counted them. There's about 2,000 entities listed here. Would you agree that that seems plausible just scanning through it?
A That seems plausible just getting through it, yes.
Q And, I mean, are you shocked to see that there are so many entities that LowerMyBills purports to have consent for them to make prerecorded messages, or is this, like, sort of par for the course with regard to this kind of evidence?
MR. MALLOW: Objection. Argumentative --
A Sorry. You referenced --
MR. MALLOW: -- and beyond the scope. Go ahead.
A You referenced "prerecorded messages." Is that your question, or is it lead generation in general?
Q Just trying to get an idea of, you know, what the hyperlink in other lead-disclosure language might refer to, and so my question is trying to get at that point.
And so the question is were you shocked to see thousands of entities that LMB purported to obtain

Page 74

**consent to call using prerecorded messages, or is this sort of what you'd expect?**
MR. MALLOW: Objection. Argumentative. Beyond the scope. Answer if you can.
A If I'm, you know, just glancing through, it looks like and from my understanding LowerMyBills, Core Digital doesn't just operate in the insurance vertical, but I see other companies here that it looks like they're generating -- or other verticals, rather, that it looks like they're generating leads for beyond just property and casualty insurance companies, which I don't know the number. I know there's a sizable amount of property and casualty insurance companies. So add in the other verticals, and it looks like they're trying to be comprehensive in their list here of all the verticals that they work with.
**Q And would that be typical for a lead generator to have a very comprehensive list like this hyperlinked from their consent language?**
MR. MALLOW: Objection beyond the scope. Lacks foundation. Answer if you know.
A I would -- as far as would it be typical, I'm not sure if I could say that. I have certainly seen instances like this, but as far as is it the norm? That's not something I don't know that I could speak to

Page 75

because I've seen instances to the contrary like was referenced earlier.
**Q Yeah, what you referenced earlier was not a hyperlink. I think that it was that you were talking about how Liberty Mutual was specifically referenced in the consent information that Jornaya had, right?**
A Correct.
**Q So as to hyperlinked entities, partners, lead, you know, providers, is it typical to have, you know, at least dozens of different insurance companies listed in the hyperlinked partners or providers?**
MR. MALLOW: Objection. Beyond the scope. Lacks foundation. Go ahead.
A I'm not sure how we would define typical here, Alex. I have seen it before. I can definitively say that.
As far as frequency goes, I don't have a clear view into that.
**Q How would one obtain a clear view into the answer to that question?**
MR. MALLOW: Objection. Beyond the scope.
**Q Is it possible?**
MR. MALLOW: Objection.
A It's not something I would have to --
MR. MALLOW: Hold on. Hold on. Objection. Beyond the scope. Lacks foundation. Calls for

Page 76

speculation. Go ahead.
A Yeah, I would just be speculating on that, Alex, if I were to respond to it.
**Q Well, let me ask you this. Do you personally know of a way to determine, you know, what the hyperlinked providers or, you know, marketing partners are for any particular lead or were at the time of the lead event?**
MR. MALLOW: Objection. Vague.
A Yeah, sorry. Could you rephrase?
**Q Is there any way that you know of to confirm what the provider network or the marketing partners were at the time of any particular lead that appeared in the hyperlinked?**
MR. MALLOW: Objection. Vague. Go ahead.
A I'm not -- I'm not sure on that. I don't know if they would maintain, you know, a history of their web page that one could get access to. I'm assuming that's what this is, but. . .
**Q Anything else?**
A No. Sorry.
**Q And in that prior answer, "they," you're referring to the lead generator; is that right?**
A That's correct.
**Q And does -- I think we established before that as a general rule, Liberty Mutual does not have contracts or**

Page 77

**agreements as to lead generation; isn't that true?**
MR. MALLOW: Objection. Misstates the testimony and vague. Go ahead.
**Q I'll say it differently. As a general matter, Liberty Mutual has a direct contract with lead aggregators, right?**
A That's correct.
MR. MALLOW: Hold on one second. Again, misstates the testimony. Go ahead.
**Q And as a general matter, unless that entity is also a lead aggregator or had some other relationship with Liberty Mutual, Liberty doesn't have any agreements with lead generators like Core Digital, right?**
A Many -- many lead aggregators are also lead generators, so, yeah, I'm not sure if -- I would have to clarify that in a response; and we do obviously have direct relationships with the lead generators who are lead aggregators.
**Q Right. Like, All Web Leads is both a lead generator and a lead aggregator, right?**
A Correct.
**Q Okay. And so, I mean, the lead sales agreement between Liberty and All Web Leads doesn't differentiate between leads that are generated by All Web Leads or generated by some other third party, right?**

MR. MALLOW: Objection. Vague. Beyond the scope.
A That's correct because we would have the same expectations regardless of whether or not they generated the lead themself or helped us in obtaining that lead through an aggregation effort.
**Q Liberty Mutual makes a lot of phone calls -- prerecorded phone calls based upon internet-generated leads, doesn't it?**
MR. MALLOW: Objection. Vague. Go ahead.
A Can you define "a lot"?
**Q Liberty makes more than 10,000 calls on a given weekday that are trying to generate new customers through prerecorded messages; isn't that right?**
A I'm not sure that it would always be more than 10,000 calls, but we are responding to the real-time market in terms of consumers raising their hand for an insurance quote in our efforts; so it would be based off from what the market is at that time.
**Q Okay. And so what's a typical number of outbound prerecorded calls that Drips is making in a particular day based upon leads that were purchased from lead aggregators and generated through third-party lead generator?**
MR. MALLOW: Objection. Beyond the scope of



this deposition.
A Yeah, I don't have that number off the top of my head.
**Q Thousands per day?**
MR. MALLOW: Same objection.
A Possibly. I think the nuance would be the number of times that a consumer would be interacting with us -- well, one nuance would be the number of times a consumer is interacting with us via SMS. So if they're interacting with us, yes, unless there is no outbound dial unless, yeah, yeah, there is -- as we mentioned earlier, there's an initial outbound dial. And if they are responding to us via SMS, they're choosing to work with us that way. And so we would be -- we would be interacting with them in that manner, so that could limit the number of phone calls.
**Q Okay. But we're talking about, you know, outbound prerecorded calls in the hundreds at least every single, you know, weekday and except holidays, right?**
MR. MALLOW: Objection. Beyond the scope of the deposition.
A Yes, again, in accordance with the number of consumers that are asking for an insurance quote.
**Q Right. Asking for an insurance quote as Liberty Mutual understands it based upon, you know, the lead**



**sales agreements that we've looked at today, right?**
MR. MALLOW: Objection. Vague. Go ahead.
A Yeah, could you restate the question, please?
**Q Well, I mean, I'm just asking -- I was asking about the number of phone calls -- and I thought it was a straightforward question. I mean, you're knowledgeable as to the outbound prerecorded message calls that Liberty Mutual makes through Drips, right?**
A Yes.
**Q So I'm just trying to get -- I'm trying to get an idea of the rough daily volume of prerecorded message sales calls that Drips makes that originated through lead aggregators and lead generators. And so would you give me an estimate of the number of sales calls -- prerecorded sales calls that Drips makes on a daily basis?**
MR. MALLOW: Objection. Beyond the scope.
A Yeah, it would be in the hundreds, probably in the thousands.
MR. BURKE: I have no further questions.
MR. MALLOW: Let me just ask a couple questions just to make sure something is clear. I can put it up, or you can put it up, Alex, Exhibit G, which is the Lead Sales Agreement. If you want me to put it up, I can unless you have it right



there.
MR. BURKE: I got it. I got it.
MR. MALLOW: Okay. Be happy to give you -- there we go. Can you go up to the top?
MR. BURKE: First page?
MR. MALLOW: Yeah.
CROSS-EXAMINATION
BY MR. MALLOW:
**Q Mr. Hemker, the Lead Sales Agreement with LeadCloud, is this the agreement that governed at the time the Fralish Lead or the Junichi (PHONETIC) Lead --**
COURT REPORTER: I'm sorry. What was that?
**Q The Lead Sales Agreement, which is Exhibit G, is this the agreement that was in place at the time that the lead in question in this case was called?**
A Yes.
**Q And if you look at definitions item 1.1C says, "Lead Sellers," do you see that?**
A Yes.
**Q Would Core Digital be a lead seller as defined in this term?**
A That term could apply to Core Digital as well, yes.
**Q Does that term apply to All World [sic] Leads?**
A All Web Leads, yes.
**Q All Web Leads. Sorry. All Web Leads?**

Page 82

A Yes, that's correct.
MR. MALLOW: That's all I have, Alex. Thanks.
MR. BURKE: I have a question here because I don't understand.

REDIRECT EXAMINATION

BY MR. BURKE:
**Q Core Digital, at least as far as you testified today, is not a lead seller because it doesn't sell leads directly to Liberty Mutual, right?**
A So Core Digital is generally known as a lead seller. We don't have an agreement directly with them. So I think that's the point that I was trying to distinguish is we may not have an agreement with them, but generally speaking, in the term, lead seller, would be a blanket statement.
**Q Okay. But in reality, the relationship between Liberty Mutual and Core Digital is one of a lead generator, not a lead aggregator or a lead seller, right?**
A That's fair.
MR. MALLOW: Hold on a second. Objection. Vague. Go ahead.
A Yeah, that's fair. I mean, they're somewhat one and -- they can be looked at as one and the same in that

Page 83

All Web Leads could be a lead seller, and Core Digital could be a lead seller as well. Lead generator would be reserved for someone who is actually generating the lead itself.
**Q But Core Digital doesn't identify and provide leads to LeadCloud that are then provided to Liberty Mutual, does it?**
A Indirectly they would do it via All Web Leads, but not directly; correct.
MR. BURKE: All right. That's all.
COURT REPORTER: What about signature?
MR. MALLOW: We will review and sign. Alex, 30 days acceptable for you?
MR. BURKE: Yeah, take what you -- what you -- you know, I think you get 30 days. I have no problem with that. We'd like a -- we'd like the transcript.
MR. MALLOW: As would we.
COURT REPORTER: Okay. Thank you.
MR. BURKE: All right. Off the record?
MR. MALLOW: Off the record.
VIDEOGRAPHER: Time on the monitor at 11:57 a.m., and we are off the record.
(DEPOSITION CONCLUDED AT 11:57 A.M. CST)

Page 84

AND FURTHER THE DEPONENT SAITH NOT.

______________________________
RYAN HEMKER as 30(b)(1)

Page 85

IN RE: JOHN FRALISH VS. LIBERTY MUTUAL INSURANCE COMPANY
DEPOSITION OF: RYAN HEMKER as 30(b)(1)
DATE TAKEN: FEBRUARY 14, 2024
Federal Rules of Procedure & Civil Procedure; after having read my deposition, I wish to make the following changes:

PAGE/LINE#_________ CHANGE________________________
__________________________________________________
REASON FOR CHANGE__________________________________

PAGE/LINE#_________ CHANGE________________________
__________________________________________________
REASON FOR CHANGE__________________________________

PAGE/LINE#_________ CHANGE________________________
__________________________________________________
REASON FOR CHANGE__________________________________

PAGE/LINE#_________ CHANGE________________________
__________________________________________________
REASON FOR CHANGE__________________________________
PAGE/LINE#_________ CHANGE________________________
__________________________________________________
REASON FOR CHANGE__________________________________
I am signing my deposition conditioned on the fact that the above-noted changes, if any, shall be placed with the original by the court reporter, and I further saith naught.
(Signature of Deponent):__________________________

STATE OF INDIANA )
) SS:
COUNTY OF VIGO )

I, Renee R. Dobson, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly placed under oath to tell the truth, the whole truth and nothing but the truth in the aforementioned matter and appeared before me via Zoom;

That the foregoing deposition was taken on behalf of the Plaintiff; that said deposition was taken at the time and place heretofore mentioned;

That said deposition was taken down in Stenograph notes and afterwards reduced to typewriting under my direction and thereafter presented to said witness for signature; and that the typewritten transcript is a true and accurate record of the testimony given by said deponent;

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of any of the parties, or otherwise interested in the event of this cause of action, and am not in the employ of the attorneys for any of the parties.

IN WITNESS WHEREFORE, I have hereunto set my hand and affixed my notarial seal this 26th day of February, 2024.

My Commission Expires: Renee R Dobson
October 15, 2031 Renee R. Dobson, Notary Public,
Commission Number NP0752232 Residing in Vigo County, Indiana